576 A.2d 1013

**COMMONWEALTH of Pennsylvania**

v.

**Sharon Louise DANFORTH, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 23, 1989.

Filed June 14, 1990.

2

4

James A. Swetz, Stroudsburg, for appellant.

E. David Christine, Dist. Atty., East Stroudsburg, for Com., appellee.

Before CIRILLO, President Judge, and CAVANAUGH, BROSKY, OLSZEWSKI, DEL SOLE, MONTEMURO, TAMILIA, KELLY, and JOHNSON, JJ.

MONTEMURO, Judge:

The issue on appeal is whether the taking and testing of a blood sample for alcohol content pursuant to one of the "implied consent" provisions of the Motor Vehicle Code, 75 Pa. C.S.A. § 1547(a)(2),[1] violates the federal and state constitutional prohibition against unreasonable searches and seizures. We find that the breath, blood and urine tests authorized by Section 1547(a)(2) are constitutionally invalid. We reverse appellant's conviction and remand for a new trial.

1. 75 Pa. C.S.A. § 1547(a)(2) (Purdon 1984).

Following a trial by jury, appellant, Sharon Louise Danforth, was convicted of driving under the influence of alcohol, 75 Pa. C.S.A. § 3731(a)(4). The trial judge denied appellant's post-trial motions and sentenced appellant to a minimum term of imprisonment of forty-eight (48) consecutive hours to a maximum term of one year.

During the early morning hours of September 29, 1987, the Coolbaugh Township police received a call for help from the Byrd residence. While responding to the call, the police encountered a serious one-car accident which had occurred a few hundred yards south of the Byrd residence. The driver's side of the vehicle was unoccupied. The police discovered that a male passenger with no apparent signs of life remained in the car. The car had impacted with a tree stump and a utility pole lying on the side of the road.

The investigating police officer continued to the Byrd residence where he found appellant who identified herself as the driver of the car involved in the accident. Appellant told the officer that earlier she had been at the Swiftwater Inn where she met a man who told her that he lived near her in Pocono Farms. At the man's request, appellant agreed to give him a ride home. During the ride, the man lunged at appellant, grabbed at her clothes, and tried to remove her blouse. Appellant told him to stop several times, but he persisted. When appellant tried to defend herself by pushing her passenger away, she lost control of the car which ran off the road into a nearby wooded area. After the accident appellant ran to the Byrd residence and called the police.

The police officer encouraged appellant to go to the hospital for treatment of her facial injuries. While appellant was receiving treatment at the hospital, the officer came to the hospital to ask more questions. When asked by the officer to recount what had happened, appellant told the same story she had told earlier while at the Byrd residence.

Based solely on the severity of the accident and the fact that a death had occurred, the officer decided to ask appellant for a blood sample. At no time did the officer suspect

that appellant was under the influence of alcohol. There was no odor of alcohol about her, her complexion appeared normal, her eyes were not bloodshot, her balance while standing was normal, and she did not need any help in walking. The officer told appellant that he was investigating the accident and that as part of the accident investigation he wanted to obtain a sample of her blood for analysis. Appellant agreed to have a sample of her blood taken. The officer did not tell appellant that the blood test was part of a criminal investigation, or that if the sample resulted in a blood alcohol content of .10% or more she could be charged and prosecuted for driving under the influence. He did not give appellant a *Miranda* warning or inform her that she may be giving evidence against herself. At no time was appellant asked to sign a consent form. A hospital laboratory technician drew blood from appellant and turned the sample over to the police officer. The police crime lab test results revealed a .21% blood alcohol level.

Appellant was arrested several weeks after the accident, on October 16, 1987, and charged with driving under the influence,[2] homicide by vehicle,[3] homicide by vehicle while driving under the influence[4] and [failing to] driv[e] vehicle at safe speed.[5]

In her pre-trial motions, appellant moved to suppress the results of the blood test on the basis that the test was taken in violation of her federal and state constitutional right against unreasonable searches and seizures. The suppression court denied the motion to suppress, finding that appellant's consent to the blood test was implied under the implied consent provision of the Motor Vehicle Code, 75 Pa. C.S.A. § 1547(a)(2). The court never addressed the issue of whether appellant voluntarily consented to the test. After a trial by jury, appellant was convicted of driving under the

2. 75 Pa. C.S.A. § 3731(a).
3. 75 Pa. C.S.A. § 3732.
4. 75 Pa. C.S.A. § 3735.
5. 75 Pa. C.S.A. § 3361.

influence. The trial court denied her post-trial motions. Following sentencing, appellant brought this timely appeal.

Appellant argues that the blood test administered pursuant to § 1547(a)(2) of the Motor Vehicle Code was unconstitutional because the police officer lacked probable cause to believe appellant was under the influence. We agree.

## I. CONSTITUTIONALITY OF § 1547(a)(2) UNDER THE FEDERAL CONSTITUTION

■ The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ... "U.S. Const. amend. IV. The Fourth Amendment applies to the States by virtue of the Fourteenth Amendment of the Federal Constitution. *New Jersey v. T.L.O.*, 469 U.S. 325, 334, 105 S.Ct. 733, 738, 83 L.Ed.2d 720 (1985). The Fourth Amendment functions as a constraint against arbitrary intrusions by the government into an individual's privacy, dignity, and security. *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *Schmerber v. California*, 384 U.S. 757, 768, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966).

■ In order for the Fourth Amendment concerns to be implicated, we must first ascertain that the test is attributable to the Government or its agents. *Commonwealth v. Cieri*, 346 Pa.Super. 77, 499 A.2d 317, 320–21 (1985) (citations omitted); *Commonwealth v. Lapia*, 311 Pa.Super. 264, 457 A.2d 877 (1983), *rev'd on other grounds, Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985). At the police officer's request, appellant's blood was drawn by a hospital technician who handed over the sample to the officer for testing. Thus, the hospital technician acted as an agent of the Commonwealth in drawing the blood sample. *See Commonwealth v. Cieri, supra* 346 Pa.Super. at 85, 499 A.2d at 321 (where private hospital nurse drew defendant's blood according to routine hospital procedure,

and later forwarded sample to police for blood alcohol test, nurse acted as an "instrument" or "agent" of the government). The analysis for blood alcohol content was performed by the state police crime laboratory. Given these facts, the taking and testing of appellant's blood are attributable to the Commonwealth.

It is well-established that the administration of a blood alcohol test is a search falling within the protection of the Fourth Amendment. *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, ——, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989), *citing Schmerber v. California, supra* 384 U.S. at 767–68, 86 S.Ct. at 1834; *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662 (1985). *See also Commonwealth v. Murray,* 441 Pa. 22, 25, 271 A.2d 500, 501 (1970); *Commonwealth v. Smith,* 382 Pa.Super. 288, 555 A.2d 185 (1989).[6] Since a blood alcohol test constitutes a search within the meaning of the Fourth Amendment, the test is constitutionally valid only if reasonable. *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *Schmerber v. California, supra* 384 U.S. at 768, 86 S.Ct. at 1834; *In re Gartley,* 341 Pa.Super. 350, 491 A.2d 851 (1985), *aff'd, In re Search Warrant B–21778,* 513 Pa. 429, 521 A.2d 422 (1987) (Fourth Amendment prohibits only those searches which are unreasonable).

As a general rule, a search or seizure is not reasonable unless it is conducted pursuant to a search warrant issued by a magistrate upon a showing of probable cause. *Commonwealth v. Quarles,* 229 Pa.Super. 363, 377, 324 A.2d 452, 460 (1974), *quoting Commonwealth v. Maione,* 227 Pa.Super. 239, 324 A.2d 556, 558 (1974). *See also Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). The warrant requirement is separate from the probable cause requirement, and, even if

**6.** Likewise, a breathalyzer test and the collecting and testing of a urine sample are searches within the meaning of the Fourth Amendment. *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, ——, 109 S.Ct. 1412, 1413, 103 L.Ed.2d 639 (1989) (citations omitted).

the search may be performed without a warrant, the search still must be based on probable cause to believe that the person to be searched has violated the law. *New Jersey v. T.L.O., supra* 469 U.S. at 340, 105 S.Ct. at 742, *citing Almeida–Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973); *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

The investigating officer in this case testified that he requested the sample of appellant's blood for testing under the authority of the provision of the Motor Vehicle Code which permits blood tests in the event that the driver is involved in an accident in which death results. The officer was referring to the provision of the "implied consent law" which provides:

§ 1547. Chemical testing to determine amount of alcohol or controlled substance

(a) General rule.—Any person who drives, operates or is in actual physical control of the movement of a motor vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath, blood or urine for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a motor vehicle:

\*  \*  \*  \*  \*  \*

(2) which was involved in an accident in which the operator or passenger of any vehicle involved or a pedestrian required treatment at a medical facility or was killed.

75 Pa. C.S.A. § 1547(a)(2).

The suppression court found that under § 1547(a)(2), appellant had given her implied consent to the chemical testing of her blood, since she had been the operator of a vehicle involved in an accident resulting in death and bodily injury which required treatment at a medical facility. Appellant concedes that the conditions of § 1547(a)(2) were

met. Appellant claims that a test performed under the authority of § 1547(a)(2) is unconstitutional in the absence of probable cause to believe the driver was under the influence of alcohol.

The question we must decide is whether, in authorizing the blood, breath or urine test of a person who is reasonably believed to have been driving a vehicle involved in an accident resulting in death or bodily injury requiring medical care, § 1547(a)(2) authorizes an "unreasonable search." We hold that searches conducted pursuant to § 1547(a)(2) are unreasonable.

### A. The Warrant Requirement

■ Section 1547(a)(2) empowers a police officer to order the taking and testing of a driver's blood without a warrant. In *Schmerber, supra,* the Supreme Court held that the importance of collecting blood samples justified waiving the warrant requirement under the "exigent circumstances" exception to the Fourth Amendment warrant requirement. *Schmerber,* 384 U.S. at 770, 86 S.Ct. at 1835 ("[T]he delay necessary to obtain a warrant ... threaten[s] 'the destruction of evidence.'") (citation omitted). Thus, we hold that the absence of a warrant requirement under § 1547(a)(2) does not render the blood, breath and urine tests unreasonable under the Fourth Amendment.

### B. Probable Cause

■ Section 1547(a)(2) authorizes the seizure and search of an accused's blood based solely on the fact that he or she was driving a vehicle which was involved in an accident in which death or an injury requiring medical treatment occurred. The authority to conduct the test hinges on the mere happening of a motor vehicle accident and on the severity of the injuries to the people involved in the accident. The statute does not require any evidence of alcohol or drug use by the driver. Under § 1547(a)(2), a police officer may order a test of a driver's blood, breath, or urine, even where, in cases such as this one, the driver gives every indication of sobriety and an immediate and

contrary explanation for the accident exists. A factual scenario meeting the bare conditions set by § 1547(a)(2) does not satisfy the Fourth Amendment requirement of probable cause. Specifically, in this case the police officer lacked probable cause to believe that appellant had been driving while under the influence of alcohol. The officer testified that he did not suspect intoxication on the part of appellant or notice any of the typical signs of alcohol consumption, such as bloodshot eyes, alcohol on the breath, a staggering walk or inability to maintain balance while standing. Further, appellant offered an explanation for the cause of the accident: she lost control of her car while struggling with her passenger who was trying to remove appellant's clothes. Nothing in the facts and circumstances known to the police officer warranted a belief that appellant had been driving under the influence. *See Commonwealth v. Smith, supra* 382 Pa.Super. at 288, 555 A.2d at 189 (1989) ("Probable cause exists when an officer has knowledge of sufficient facts and circumstances, gained through trustworthy information, to warrant a prudent man to believe that the person seized has committed a crime.") (citation omitted).

We hold that a test administered solely on the basis of the existence of the conditions set by § 1547(a)(2) is an unreasonable search prohibited by the Fourth Amendment, since facts meeting the § 1547(a)(2) criteria do not support a finding of probable cause to believe that the driver of the vehicle was under the influence.[7]

### C. "Special Needs" Exception

While both the existence of probable cause and the requirement of a warrant bear on the reasonableness of a search, in certain exceptional circumstances neither is required. *Skinner, supra* 489 U.S. at ——, 109 S.Ct. at 1414, 103 L.Ed.2d at 661; *Almeida–Sanchez, supra* 413 U.S. at

7. We note that if an officer does have probable cause to believe a driver has been driving under the influence, the officer has the authority to order a blood, breath or urine test under 75 Pa. C.S.A. § 1547(a)(1). The constitutionality of tests administered pursuant to § 1547(a)(1) has been upheld. *Commonwealth v. Quarles, supra* 229 Pa.Super. at 388, 324 A.2d at 666.

277, 93 S.Ct. at 2541 (Powell, J., concurring). In a limited number of cases, the United States Supreme Court has held that a warrantless search conducted without probable cause may nevertheless withstand the test of reasonableness under the Fourth Amendment when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Skinner, supra* 489 U.S. at ——, 109 S.Ct. at 1414, *quoting Griffin v. Wisconsin,* 483 U.S. 868, 873–874, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, ——, 109 S.Ct. 1384, ——, 103 L.Ed.2d 685, 702 (1989); *New Jersey v. T.L.O.,* 469 U.S. at 351, 105 S.Ct. at 747. In these cases, the Court has balanced the intrusion on the individual's privacy interests against the government's need to conduct the search to determine whether the search is reasonable. *Von Raab, supra* 489 U.S. at ——, 109 S.Ct. at ——, 103 L.Ed.2d at 700; *Skinner, supra* 489 U.S. at ——, 109 S.Ct. at 1414.

Importantly, these "special needs" cases involve civil searches taking place outside of the context of criminal investigations. *See Von Raab, supra,* (United States Customs Service drug testing of employees seeking transfer or promotion to certain positions); *Skinner, supra,* (Federal Railroad Administration safety regulations authorizing alcohol and drug testing of employees); *Griffin v. Wisconsin, supra,* (search of probationer's home); *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (work-related searches of employees' desks and offices); *New York v. T.L.O., supra,* (search of student's pocketbook by school officials).[8]

In *Skinner, supra,* the Supreme Court upheld Federal Railroad Administration regulations which, in part, mandate

---

**8.** Although in certain cases involving minimally intrusive searches arising in the criminal context the Supreme Court has relaxed the probable cause standard, the Court has still required a showing of individualized or reasonable suspicion to justify the searches in these instances. *See United States v. Sokolow,* 490 U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Brignoni–Ponce,* 422

blood and urine tests of railroad crew members in the event of a railroad accident involving a fatality, without requiring individualized suspicion of any particular employee. The Court, applying its balancing test, reasoned that the government's interest in regulating the conduct of railroad employees engaged in safety-sensitive tasks outweighed the employees' privacy interests. *Skinner, supra* 489 U.S. at ——, 109 S.Ct. at 1421. Although the regulations in *Skinner* bear a resemblance to § 1547(a)(2), we conclude that the *Skinner* holding does not compel a finding that the tests authorized by § 1547(a)(2) are reasonable within the meaning of the Fourth Amendment. In *Skinner*, the Court stresses the point that the FRA regulations were not promulgated to aid law enforcement in the criminal prosecution of employees but rather were intended " 'to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.' " *Skinner, supra* at ——, 109 S.Ct. at ——, 103 L.Ed.2d at 662, *quoting* 49 CFR § 219.1(a) (1987). *See also, Von Raab, supra* 489 U.S. at ——, 109 S.Ct. at 1391, 103 L.Ed.2d at 703 ("Our cases teach, however, that the probable-cause standard 'is peculiarly related to criminal investigations.' ").

Unlike the Court in *Skinner*, we find that there are no "special needs, beyond the normal need for law enforce-

U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In a few cases, the Supreme Court has upheld searches conducted without individualized suspicion where the searches were conducted in the context of regulatory programs and involved routinized, nonintrusive stops and searches. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (interrogative stop at permanent border checkpoint to ascertain motorist's residence status); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (routine annual inspection by city housing department). Unlike the "substantially less intrusive" searches in these cases, the blood, breath and urine tests in question here entail full-scale searches directly impacting on the individual's privacy. Even if the searches in this case did not involve significant intrusions, § 1547(a)(2) does not meet the less stringent standard of reasonableness applied in these cases since the statute authorizes the tests absent any showing of individualized suspicion.

ment," presented by this case to justify a relaxation of the strict probable cause standard imposed by the Fourth Amendment. The governmental purpose underlying § 1547(a)(2) is to enable the police to gather evidence of intoxication or drug use to be used in criminal proceedings against drivers of vehicles involved in accidents. *See* 75 Pa.C.S.A. § 1547(c). *See also Commonwealth v. Funk,* 254 Pa.Super. 233, 240, 385 A.2d 995, 999 (1978) ("primary consideration in enacting the implied consent statute was evidentiary"); *Commonwealth v. Quarles, supra* 229 Pa. Super. at 381, 324 A.2d at 462 (Commonwealth's interest reflected in implied consent law is to obtain evidence that can be used against drunken drivers in criminal proceedings). Section 1547(a)(2) is a provision within a statute which criminalizes drunken driving. Thus, the searches authorized by § 1547(a)(2) do not fall within the scope of the civil searches at issue in the *Skinner* case.

We refuse to extend the holding of *Skinner* to the context of a criminal investigation of a driving under the influence case. As this Court has noted,

[a] defendant in a criminal prosecution has much at stake-his reputation, his continued capacity to work, and most important, his freedom. The rights provided him by the Fourth Amendment are most important when the stakes are so high.

*Commonwealth v. Quarles, supra,* 229 Pa.Superior Ct. at 381, 324 A.2d at 462. While we recognize the substantiality of the Commonwealth's interest in eradicating the problem of drunk driving, and we recognize that evidence of blood alcohol diminishes with time, we cannot conclude that the highly intrusive blood, breath and urine tests designed to lead to evidence for use in criminal proceedings are constitutionally valid in the absence of probable cause. In *Schmerber, supra,* the Supreme Court noted that police must have evidence of a drunk-driving suspect's impairment before forcing him or her to endure a blood test:

The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions

on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear.

*Schmerber, supra* 384 U.S. at 769–70, 86 S.Ct. at 1835. We find no authority in current Supreme Court cases which would support a relaxation of the probable cause standard, embodied in the plain text of the Fourth Amendment, for the blood, breath and urine tests at issue in this case.[9]

We hold that § 1547(a)(2) authorizes unreasonable searches in violation of the Fourth Amendment. The taking and testing of appellant's blood amounted to an unconstitutional search and seizure. The results of the blood test were not admissible at trial.

## II. CONSTITUTIONALITY OF § 1547(a)(2) UNDER PENNSYLVANIA CONSTITUTION ARTICLE I, SECTION 8

The state constitutional counterpart to the Fourth Amendment is found in Article 1, Section 8, which provides:

**9.** While the the dissenting opinion acknowledges that the *Skinner* Court expressly limited its holding to non-law-enforcement situations, the dissent maintains that an extension of the *Skinner* holding to the context of criminal prosecutions is nonetheless warranted under the facts of this case. The dissent's application of *Skinner* contradicts established doctrine on search and seizure, which requires a showing of probable cause or, in some cases, reasonable suspicion, *see supra* note 8, before a search for prosecutorial evidence can be conducted. There is no question that the Commonwealth has an important interest in removing drunk drivers from the roads and that the Commonwealth has the power to criminalize driving under the influence. Any such regulation, however, must comply with constitutional mandates. The concern that evidence will be lost or destroyed or that a party will escape from accountability has never been a justification for eliminating the requirement that the police have probable cause or, in those cases involving minimally intrusive searches, reasonable suspicion that the desired evidence will be found. Nor has the rate of occurrence of a particular type of criminal offense ever been a justification for conducting searches without probable cause where the search involves the level of intrusion involved in the tests at issue here.

As discussed above in section A, it is well settled that a police officer need not secure a warrant before obtaining a blood sample from a person suspected of driving under the influence.

### § 8. Security from searches and seizures

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. 1, § 8.

While we hold today that the searches authorized by § 1547(a)(2) violate the federal constitution, we also find, as a matter of state law, independent of the federal constitution, that the searches are constitutionally invalid under our state constitution. As a general rule, the Pennsylvania Constitution requires a showing of probable cause before a search or seizure occurs.[10] Since § 1547(a)(2) does not require any evidence of a crime upon which the blood, breath, and urine tests may be based, we conclude that the tests authorized by § 1547(a)(2) offend our constitution's restraints against unreasonable searches and seizures.

In interpreting article I, section 8, our Supreme Court has explained the interplay between the federal and state constitutional protection of fundamental liberties:

While minimum federal constitutional guarantees are "equally applicable to the [analogous] state constitutional provision," see, e.g., Commonwealth v. Platou, 455 Pa. 258, 260 n. 2, 312 A.2d 29, 31 n. 2 (1973), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), the state has the power to provide broader standards than those mandated by the federal Constitution:

10. In a limited number of circumstances, our Supreme Court has relaxed the traditional requirement of probable cause and adopted the balancing test used by the United States Supreme Court in Fourth Amendment cases, analyzing article I, section 8 issues by balancing the individual's privacy interests against the governmental interest in conducting the search. See Commonwealth v. Tarbert, 517 Pa. 277, 290–91, 535 A.2d 1035, 1041 (1987) (applying Fourth Amendment balancing test to systematic drunk driving roadblocks). We find that application of the balancing test in the present case would be inappropriate, given the high level of intrusiveness of the § 1547(a)(2) searches.

It is well settled that a state may provide through its constitution a basis for the rights and liberties of its citizens independent from that provided by the Federal Constitution, and that the rights so guaranteed may be more expansive than their federal counterparts. *Prune-Yard Shopping Center v. Robins,* 447 U.S. 74, 80–82, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741 (1980); *see Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *Cooper v. California,* 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967). See also *Commonwealth v. Ware,* 446 Pa. 52, 284 A.2d 700 (1971), cert. granted sub nom. *Pennsylvania v. Ware,* 405 U.S. 987, 92 S.Ct. 1254, 31 L.Ed.2d 453, subsequently vacated and denied, 406 U.S. 910, 92 S.Ct. 1606, 31 L.Ed.2d 821 (1972) ("it appearing that the judgment below rests upon an adequate state ground"). This Court has on numerous occasions recognized the Pennsylvania Constitution to be an alternative and independent source of individual rights. See, e.g. *Willing v. Mazzocone,* 482 Pa. 377, 393 A.2d 1155 (1978); *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975); *Commonwealth v. Knowles,* 459 Pa. 70, 73 n. 3, 327 A.2d 19, 20 n. 3 (1974); *Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, 173 A.2d 59, cert. denied, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961). *Commonwealth v. Tate,* 495 Pa. 158, 169–70, 432 A.2d 1382, 1387–1388 (1981).

This Court has not hesitated to interpret the Pennsylvania Constitution as affording greater protection to defendants than the federal Constitution. *See, e.g., Commonwealth v. Bussey,* 486 Pa. 221, 404 A.2d 1309 (1979); *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975); *Commonwealth v. Richman,* 458 Pa. 167, 320 A.2d 351 (1974); *Commonwealth v. Campana,* 452 Pa. 233, 304 A.2d 432, vacated, 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 (1973), *on remand,* 455 Pa. 622, 314 A.2d 854,

*cert. denied,* 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974).

*Commonwealth v. Tarbert, supra* 517 Pa. at 282–83, 535 A.2d at 1037–38, *quoting Commonwealth v. Sell,* 504 Pa. 46, 63–64, 470 A.2d 457, 466–67 (1983).

In several instances, our Courts have imposed higher standards on searches and seizures than the standards required by the Federal Constitution. *See Commonwealth v. Sell, supra* (under Article I, section 8, defendant who was charged with possessory offense has automatic standing to challenge admissibility of evidence alleged to be fruit of illegal search and seizure); *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980) (under Article I, section 8, bank customers have legitimate expectation of privacy in records kept at a bank pertaining to their affairs, and, thus, have standing to challenge the admissibility of the records); *Commonwealth v. Beauford,* 327 Pa.Super. 253, 475 A.2d 783 (1984), *appeal dismissed,* 508 Pa. 319, 496 A.2d 1143 (1985) (under article I, section 8, installation and use of pen registers and dialed number recorders requires a judicial order based upon probable cause).

In light of the United States Supreme Court's willingness, in some circumstances, to uphold blood, breath and urine tests in the absence of probable cause to believe that the individual being tested is under the influence of alcohol or a controlled substance, we hold that our state constitution provides broader protection against such searches. We conclude that article I, section 8 requires a showing of probable cause before the police can order a blood, breath or urine search.

### III. ACTUAL CONSENT

The Commonwealth argues that the test results were admissible at trial because appellant voluntarily consented to the testing. It is well-settled that an actual, voluntary consent to a search will eliminate the warrant and probable cause requirements of the Fourth Amendment.

*Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Commonwealth v. Walsh,* 314 Pa.Super. 65, 460 A.2d 767, 771 (1983), *citing Zap v. United States,* 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477 (1946); *Commonwealth v. Anderson,* 208 Pa.Super. 323, 329, 222 A.2d 495, 498 (1966). *See also Commonwealth v. Watkins,* 236 Pa.Super. 397, 344 A.2d 678 (1975).

"[W]hether consent has been voluntarily given is a question of fact which must be determined in each case from the totality of the circumstances." *Commonwealth v. Walsh, supra* 314 Pa.Super. at 74, 460 A.2d at 771, *quoting Commonwealth v. Watkins, supra* 236 Pa.Super. at 399, 344 A.2d at 679. Some of the relevant factors that mitigate in favor of a finding that the consent was voluntary are:

(1) if the defendant's background indicates his understanding of investigating procedures or his understanding of his constitutional rights, [*Commonwealth v. Dressner,* 232 Pa.Super. 154, 157, 336 A.2d 414, 415 (1975)]; (2) if the suspect has aided an investigation or search, as by providing a key, *Id.;* (3) if the consenter believed the evidence to be so well concealed that it probably would not be discovered, *Id.;* (4) the fact of some prior cooperation by the consenter which produced no incriminating evidence, *Id.;* (5) if the consenter was advised of his constitutional rights prior to giving his consent, *Id.;* (6) if the suspect felt that the best course of conduct was cooperation given the fact the he had been caught virtually "red-handed", *Commonwealth v. Griffin,* 232 Pa.Super. 163, 169, 336 A.2d 419, 421 (1975); and (7) the presence of probable cause to arrest or search the suspect, *Commonwealth v. Thompson,* 292 Pa.Super. 108, 113–14, 436 A.2d 1028, 1031 (1981).

*Commonwealth v. Mancini,* 340 Pa.Super. 592, 603–604, 490 A.2d 1377, 1383 (1985). Some of the factors that weigh against a finding that the consent was voluntary are:

(1) that the defendant was interrogated numerous times while the defendant was in custody for hours, *Commonwealth v. Smith,* 470 Pa. 220, 228–29, 368 A.2d 272, 277

(1977) (a defendant was questioned while in custody for twelve hours); (2) that the police used express or implied threats to obtain the defendant's consent, *Id.;* (3) that the defendant acquiesced in an order, suggestion, or request of the police, *Id.;* and (4) the lack of probable cause to arrest or search the subject, *Commonwealth v. Thompson, supra.*

*Commonwealth v. Mancini, supra* 340 Pa.Super. at 604, 490 A.2d at 1383–84.

In light of these factors, we find that appellant's consent was not valid. Nothing in appellant's background indicates that she has an understanding of investigating procedures or an understanding of her constitutional rights. Nothing in the record shows that she had any encounters with the criminal justice system prior to her arrest in this case, or that she was ever employed in the law enforcement field. Further, in *Commonwealth v. Walsh, supra,* this Court noted that any understanding of investigative procedures would not weigh in favor of a finding of an intelligent and knowing consent in the absence of some awareness that the blood test being consented to was part of a criminal investigation. *Commonwealth v. Walsh, supra* 314 Pa.Super. at 75–76, 460 A.2d at 772. The Court concluded that if the defendant "can establish that he had no notice of the criminal investigative purpose of the blood test, his consent would be invalid." *Id.,* 314 Pa.Superior Ct. at 77, 460 A.2d at 773. In *Commonwealth v. Walsh,* the determinative factors which led the Court to conclude that the consent was voluntary were that the patrolman gave a *Miranda* warning, explained the consent form to appellee, and had appellee sign the consent form. *Id.,* 314 Pa.Superior Ct. at 77–78, 460 A.2d at 773. *See also Commonwealth v. Elliott,* 376 Pa.Super. 536, 546 A.2d 654 (1988) *appeal denied,* 521 Pa. 617, 557 A.2d 721 (1989) (where defendant was given *Miranda* warnings, and read and signed a consent form, defendant voluntarily consented to the search); *Commonwealth v. Chiesa,* 329 Pa.Super. 401, 478 A.2d 850 (1984) (where defendant had been thoroughly informed of

his *Miranda* rights and had signed a written consent form prior to the search, defendant had voluntarily consented to the search).

▪▪ The uncontradicted evidence in this case shows that appellant had no notice of the criminal investigative purpose of the blood test. She was not given a *Miranda* warning or told that the results of the blood test could be used against her in a criminal proceeding, nor did she sign a consent form. Although it was a police officer, rather than a member of the hospital staff, who requested that appellant submit to the test, this fact is not sufficient to establish that appellant had notice that the investigation was criminal in nature. Appellant had summoned the police to the scene of the accident. Despite appellant's reluctance to seek medical care, the officer encouraged her to go to the hospital for treatment of her facial injuries, and then followed her to the hospital to obtain a blood sample. Before requesting the sample, the officer assured appellant that she was not under arrest and that for furtherance of his accident investigation, he would like to obtain a blood sample. Appellant had no reason to believe that the investigation was any different from a routine accident investigation. Given these facts, we must conclude that appellant was not put on notice of the possible criminal ramifications of the blood test.[11]

Further, appellant had not been caught "red-handed" in some criminal act, and the police did not have probable cause to arrest her or order the blood test. On the basis of all of these circumstances, we hold that appellant's consent was not valid.[12]

11. We do not hold that the giving of *Miranda* warnings is necessary for a finding of valid consent. The absence of *Miranda* warnings is one factor which supports a finding that appellant was unaware of the criminal nature of the investigation.

12. In his Dissenting Opinion, Judge Kelly completely and without foundation mischaracterizes our analysis as injecting a Fifth Amendment "knowing and intelligent" waiver analysis into a Fourth Amendment voluntary consent case. As stated above, whether a consent is voluntary must be determined in each case from the totality of the circumstances, in consideration of the factors delineated above. We do not hold that the failure to give a *Miranda* warning precludes a

We hold that the breath, blood and urine tests authorized by § 1547(a)(2) of the Motor Vehicle Code constitute unreasonable searches in violation of our federal and state constitutions. We conclude that the police officer did not have probable cause to order the taking and testing of appellant's blood, and appellant did not validly consent to the test. Because the blood alcohol test was administered in violation of appellant's constitutional rights, the results of the test were not admissible at trial. *See Commonwealth v. Williams,* 380 Pa.Super. 227, 551 A.2d 313, 317 (1988). We vacate the judgment of sentence and remand for a new trial.

Vacated and remanded. Jurisdiction is relinquished.

Joined by CIRILLO, President Judge, and CAVANAUGH, DEL SOLE and JOHNSON, JJ.

OLSZEWSKI, J., files a concurring opinion.

TAMILIA, J., files a dissenting opinion joined by BROSKY, J.

KELLY, J., files a dissenting opinion.

finding of valid consent. *See supra* n. 11. We find the case of *Commonwealth v. Walsh, supra,* to be particularly relevant because of its factual similarity to the case at hand. The cases relied upon by the dissent either support our holding or are easily distinguishable from this case. For example, in *Commonwealth v. Slaton,* 383 Pa.Super. 301, 556 A.2d 1343 (1989), an *en banc* panel of this Court held that the appellant pharmacist did not voluntarily consent to a search of his prescription files where he was not informed that he was suspected of criminal conduct and the search was for evidence to be used against him. In *Commonwealth v. Albrecht,* 510 Pa. 603, 511 A.2d 764 (1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987), the Supreme Court found that the appellant had voluntarily consented to a search of his car where he had signed a consent form which had been negotiated by his attorney. The consent form stated, in part, that the appellant had been "informed of my constitutional right not to have a search made of the vehicle ... without a search warrant and my right to refuse to consent to such a search...." *Id.* 510 Pa. at 613, 511 A.2d at 769. An extensive discussion of every case regarding the voluntariness of consent is both unnecessary and pointless, because each case must be decided on the basis of its particular facts; thus, we shall avoid this exercise in futility. We reiterate that under the circumstances of this case, appellant's consent was not voluntary.

OLSZEWSKI, Judge, concurring:

I agree with the decision reached by the majority; however, I write separately to emphasize the limited scope of our decision.

The decision reached by the majority is compelled by long-standing precedent. Taking blood samples constitutes a search and seizure. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Contrary to the implication of 75 Pa.C.S.A. § 1547(a), drivers cannot be "deemed" to consent to warrantless searches and seizures as a condition on the right or privilege of driving. *Commonwealth v. Quarles*, 229 Pa.Super. 363, 324 A.2d 452, 460–462 (1974). The blood test must fall under some recognized exception to the warrant requirement. *Id.*

Ordinarily, blood tests are justified on grounds of probable cause. 75 Pa.C.S.A. § 1547(a)(1); *Commonwealth v. Quarles*, 229 Pa.Super. 363, 324 A.2d 452, 460–462 (1974) (holding that blood tests are constitutional where there is probable cause). In the present case, the blood test was based solely on the severity of the accident, applying 75 Pa.C.S.A. § 1547(a)(2). Severity of the accident, standing alone, is not sufficient grounds to justify a warrantless blood test; accordingly, 75 Pa.C.S.A. § 1547(a)(2) is unconstitutional.

Where, as here, the only reason for the blood test is the severity of the accident, a blood test is an illegal search and seizure. If the police officer in this case had noticed any signs of intoxication, such as an odor of alcohol, bloodshot eyes, lack of coordination or slurred speech, the blood test would have been authorized by 75 Pa.C.S.A. § 1547(a)(1). *See, e.g., Commonwealth v. Haynos*, 363 Pa.Super. 1, 525 A.2d 394 (1987), *Commonwealth v. Pelkey*, 349 Pa.Super. 373, 503 A.2d 414 (1985) (probable cause based on existence of an accident and odor of alcohol on the driver's breath). Consequently, our decision affects only those cases in which the officer requesting the blood test has no reason to suspect intoxication.

Furthermore, while I concur with the majority's conclusion that appellant did not actually consent to the blood test, I disagree with the majority's suggestion that *Miranda* warnings are necessary for valid consent. It is sufficient if the person tested understands the nature and purpose of the blood test and the right to refuse. *Miranda* warnings may be evidence of voluntary consent, but they are not required.

TAMILLIA, Judge, dissenting:

This case involves a one-car accident in which the passenger was killed. Following the accident, the appellant, who was driving, went to a nearby residence where she called the police. The police responded to the call and on the way to the residence, encountered a car with the driver side unoccupied and the passenger dead. The car had gone off the road and struck a tree stump and a utility pole which was lying on the side of the road. Moreover, because of its force and speed, the vehicle became impaled on the pole through the passenger compartment killing the passenger. At the residence, the appellant identified herself to the police as the driver. She informed the police that earlier in the evening, while at an Inn, she met the man who was her passenger, and while driving him home, he had lunged at her, attempting to remove her blouse. In defending herself, she lost control of the vehicle and ran off the road. After the accident, she ran to the Byrd residence from where she called the police. The police encouraged her to go to the hospital for treatment of her facial injuries. While she was receiving treatment at the hospital, the police arrived there and questioned her.

Based on the severity of the accident and the death of the passenger, the officers requested appellant to provide them with a blood sample. They did not detect an odor of alcohol on her breath nor were they able to observe any of the usual indicators of alcohol use. Appellant consented to the test and her blood tested, after the lab work done by the police, with a blood alcohol content of .21 per cent. Police

did not give her *Miranda* warnings nor did they inform her that the test could result in criminal charges if she was found to be intoxicated according to the legal standards established by law.

As a result of the blood test finding of .21 per cent, appellant was charged with driving under the influence, homicide by vehicle, homicide by vehicle while driving under the influence and driving at unsafe speed. Following her arraignment and, in due course, a motion to suppress the blood test was presented alleging that the blood test was inadmissible as evidence because there was no probable cause for obtaining a blood test, the appellant had not been warned that she was subject to criminal prosecution, and she was not informed she was entitled to counsel under *Miranda*. The trial court denied the motion and held that because of the implied consent statute, 75 Pa.C.S. § 1547 Chemical testing to determine amount of alcohol or controlled substance, the police had a right to obtain the blood sample. Thereafter, appellant, following a jury trial, was convicted only of driving under the influence of alcohol, 75 Pa.C.S. § 3731(a)(4). Following denial of her post-trial motions, appellant was sentenced to forty-eight (48) hours to one (1) year imprisonment. This appeal followed.

The majority acknowledges the police procedure conformed with the statute as written, and in analyzing *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and other state and federal cases, finds that while the police and court complied with the statute and procedures it provides, the statute is unconstitutional. It is the contention of the majority that under the fourth amendment of the Federal Constitution, having to do with search and seizure, and the eighth section of article I of the Pennsylvania Constitution, likewise concerning search and seizure, the statute relied upon by the police and affirmed by the court is unconstitutional as it provides for search without probable cause in cases such as this.

I respectfully disagree with the result reached by the majority and believe that throughout most of the Opinion, it has provided the supporting law and judicial interpretations which permit a finding of constitutionality, sufficient to justify testing under the circumstances of this case. It is only the conclusion of the majority and its refusal to take the necessary step of interpreting both *Skinner, supra,* and other cases to sustain the constitutionality of the statute to which I dissent. It is my belief that the statute, under the very limited special circumstances of this class of case, supplies the necessary substitute for probable cause due to very important public interest considerations which, when balanced against the private interests, require the exercise of a search.

As developed in the majority Opinion tracking the *Skinner* analysis, every aspect of search and seizure related to this case has been identified and resolved. *Skinner* had to do with railroad regulations pursuant to the Federal Railroad Safety Act of 1970 which authorized the secretary of transportation to promulgate rules and regulations for all areas of railroad safety. Finding that alcohol and drug abuse by railroad employees poses a serious threat to safety, the Federal Railroad Administration (FRA) prcmulgated regulations mandating blood and urine tests of employees who were involved in certain train accidents.[1] *Skinner* involved a motion by certain employees of railroads to enjoin the regulation. The case, in due course, reached the United States Supreme Court, which reversed the Court of Appeals in its holding that these regulations were violative of the fourth amendment search and seizure provisions. In reversing the appeals court, the Supreme Court directed its attention to the multi-faceted fourth amendment issues presented, resolving all of them in favor of the interest of the public rather than the private interest of the individual.

---

**1.** There were other provisions of the regulations, dealing with testing of employees on mere suspicion when no accident had occurred, which were discussed and approved by the Supreme Court but which are not relevant to this review.

In so holding, the Supreme Court found that blood, urine and breathalyzer tests were subject to the Federal Constitution's fourth amendment application. It found that the FRA was an agent of the government and, therefore, such fourth amendment rights applied to their regulations.

*Skinner* went on to say that whether a search or seizure is reasonable under the Federal Constitution's fourth amendment depends on all the circumstances surrounding the search or seizure. The fourth amendment prohibitions against search and seizure relate to *unreasonable* search and seizure. It reaffirmed that except in certain well-defined circumstances, a search or seizure in a criminal case is not reasonable under the fourth amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause. However, the evaluation and inquiry as to search and seizure under these circumstances did not end there. In requiring a warrant, pursuant to the fourth amendment, to justify a search and seizure, the purpose is to assure the citizen that the intrusion is authorized by law and that it is narrowly limited in the objectives and scopes, and also provides for the detached scrutiny of a neutral magistrate and thus ensures an objective determination whether an intrusion is justified in any given case. *Skinner* cited the cases which hold that we must strike the balance in favor of the procedure described by the warrant clause of the fourth amendment in most criminal cases. However, it recognized exceptions to the rule when *special needs* beyond the normal need for law enforcement make the warrant and probable cause requirements impracticable. *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).

"When faced with such special needs, we have not hesitated to balance the governmental and privacy interest to assess the practicality of the warrant and the probable cause requirements in the particular context." *See e.g., Griffin, supra* at 868, 107 S.Ct. at 3164, 97 L.Ed.2d at 709 (search of a probationer's home); *New York v. Burger,* 482 U.S. 691, 699–703, 107 S.Ct. 2636, 2642–2644, 96 L.Ed.2d 601

(1987) (search of premises of certain highly regulated businesses); *O'Conner v. Ortega*, 480 U.S. 709, 721–725, 107 S.Ct. 1492, 1500–1502, 94 L.Ed.2d 714 (1987) (work-related searches of employees' desks and offices); *New Jersey v. T.L.O.*, 469 U.S. 325, 337–342, 105 S.Ct. 733, 740–743, 83 L.Ed.2d 720 (1985) (search of student's property by school officials); *Bell v. Wolfish*, 441 U.S. 520, 558–560, 99 S.Ct. 1861, 1884–1885, 60 L.Ed.2d 447 (1979) (body cavity searches of prison inmates), cited at *Skinner, supra* at ——, 109 S.Ct. at ——, 103 L.Ed.2d at 661. In those cases, as with *Skinner*, the Supreme Court held that the government's interest in regulating the conduct of the persons involved, whether it be the railroads, government office, school or prison, presents a special need beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements. *Skinner, supra* 489 U.S. at ——, 109 S.Ct. at ——, 103 L.Ed.2d at 662.

In *Skinner* at footnote 5, the court stated: "We leave for another day the question whether routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the administrative nature of the Agency's program." It would not deal with the possibility that the regulations were a pretext to enable law enforcement authorities to gather evidence of penal law violations. However, in refusing to decide that issue because it was not there presented, *Skinner* did not rule out a statute such as that with which we deal here, which, without pretext, intends to use the implied consent of the individual to enable procurement of evidence from blood, breathalyzer or urine tests in order to determine whether that person had violated the law in driving while under the influence. The rationale in *Skinner*, that neither a warrant nor a showing of probable cause or reasonable suspicion is required to permit the intrusion for the purposes of the regulation, is applicable to the statute under scrutiny here, and the governmental

interest involved in the statute is just as important as a regulation such as that promulgated by the FRA.

*Skinner* goes on to state that an essential purpose of a warrant requirement is to protect the privacy interests by ensuring citizens subject to search or seizure that such intrusions are not the random or arbitrary acts of government agents. A warrant assures the citizen that the intrusion is authorized by law and that it is narrowly limited in its objectives and scope. *See e.g., New York v. Burger, supra* at 691, 96 L.Ed.2d at 601, 107 S.Ct. at 2636. A warrant also provides the detached scrutiny of a neutral magistrate and thus ensures an objective determination whether an intrusion is justified in any given case. *See United States v. Chadwick,* 433 U.S. 1, 9, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). The Supreme Court then makes the essential point which needs to be made here, that *in the present context a warrant would do little to further these aims.* Paraphrasing *Skinner, supra* at ——, 109 S.Ct. at ——, 103 L.Ed.2d at 663, both the circumstances justifying toxilogical testing and the permissible limits of such intrusions are defined narrowly and specifically in the statute which authorizes them. This provides the necessary focus and restriction which normally is supplied by a showing of probable cause and the disinterested review by a neutral magistrate.

While we may not rely on the presumption that everybody knows the law for this purpose, in terms of its exact textual content, we may presume everybody knows that one may not drive while under the influence of alcohol. Carrying further the logic propounded by *Skinner,* in light of the standardized nature of the tests and the minimal discretion vested in those charged with administering the testing, there are virtually no facts for a neutral magistrate to evaluate. *Skinner, supra* at ——, 109 S.Ct. at ——, 103 L.Ed.2d at 663. Going further, the Supreme Court stated it recognized the government's interest in dispensing with the warrant requirement is at its strongest when, as here, the burden of obtaining a warrant is likely to frustrate the

governmental purpose behind the search. They concluded that imposing a warrant requirement in the context of a railroad accident would add little to the assurance of certainty and regularity already afforded by the regulation, while significantly hindering and, in many cases, frustrating the objectives of the government's program. Therefore, the warrant is not essential to render the intrusion at issue with the reasonableness requirement of the fourth amendment. The identical considerations are applicable here.

Going forward to the next prong of search and seizure under the fourth amendment, *Skinner* analyzed the findings that even when a warrant is not required as a general matter, a search may not be instituted unless probable cause exists to believe the person violated the law. *Skinner* held that a showing of individualized suspicion is not a constitutional floor below which a search must be presumed unreasonable. *United States v. Martinez–Fuerte*, 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). In limited circumstances where the privacy interests implicated by the search are minimal and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion. We believe this is true of the intrusions in question here. In *Schmerber v. California*, 382 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court held that the intrusion of the state pursuant to statute, in drawing a blood sample from a driver suspected of driving while intoxicated, despite his refusal to consent, was proper as the intrusion is not significant since such tests are common place and, in most persons, involve no risk or trauma. *Skinner* went on to analyze the intrusion accompanying the breathalyzer or urine test as well and found that neither of those imposed a significant intrusion. Going further in its analysis, *Skinner* determined that since these intrusions were not considered to be significant intrusions and, in contrast, the government interest in testing, even

without a showing of individual suspicion or probable cause was compelling, the probable cause requirement would be unrealistic under the circumstances of these types of laws and regulations. I would not conclude, therefore, that a test would be significantly intrusive simply because it implicated possible criminal prosecution.

The majority also finds, as stated before, that taking a blood sample pursuant to the statute was unconstitutional under article 1, section 8, of the Pennsylvania State Constitution. There is little distinction between the Pennsylvania Constitution and the Federal Constitution in terms of search and seizure, and while it is true that the State Constitution may be construed more broadly than the Federal Constitution, in the area of criminal law there has been relatively little expansion of the State Constitution in this regard. Like the federal courts, this Court and the Pennsylvania Supreme Court have determined the Pennsylvania Constitution does not prohibit certain arrests without warrant or without probable cause if special circumstances exist. The majority relies particularly on *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (1987), which held that a roadblock is not a permissible means for deterring drunk driving, as in applying the balancing test it cast too broad a net for that purpose. This holding is easily distinguishable from the present case in that specifically identified individuals pursuant to the statute are subject to testing, whereas in a roadblock, the persons have not been specifically identified and it is a random intrusion which depends on luck rather than particular conditions of identification to ascertain the person to be tested. Here, because of the special concerns for determining whether serious accidents and death were caused at least in part because of ingestion of alcohol or drugs, a serious and important governmental interest is implicated which justifies testing all persons who fit in that single limited and very narrow category. The relationship between alcohol and drug ingestion and serious accidents is so well documented that it need not be spelled out here. The special needs of the government in this class

of cases are superior to the requirement of a warrant or probable cause in taking a blood sample.

A review of the Pennsylvania case law on this issue is, to a degree, informative but does not address the constitutionality of such a provision. In *Commonwealth v. Quarles*, 229 Pa.Super. 363, 324 A.2d 452 (1974), the issue concerning implied consent was addressed in relation to that portion of the statute which had to do with an arrest for drunken driving where it was suspected the party was under the influence. In interpreting the section which is now 75 Pa.C.S. § 1547(a), this Court determined the legislature had injected a probable cause requirement in a warrantless prearrest search, which was constitutional. Statutory reenactments since *Quarles* have been substantially the same in respect to the driving while under the influence section, but since that time, the section under question has been added which does not require a probable cause basis for obtaining a blood test. *Quarles* is, therefore, not helpful to us in coming to a decision in this matter. Cases which followed *Quarles, Commonwealth v. Cieri*, 364 Pa.Super. 77, 499 A.2d 317 (1985), and *Commonwealth v. Pelkey*, 349 Pa.Super. 373, 503 A.2d 414 (1985), were, likewise, rulings which turned on the existence of probable cause and the issue present in this case was not raised. *Commonwealth v. Smith*, 382 Pa.Super. 288, 555 A.2d 185 (1989), involved the same issue as is presented here, that is, an accident resulting in injury and death with blood being extracted at a hospital. In that case, however, there was noticeable evidence of alcohol ingestion, and even though the sample was taken without consent, it was held to be a valid taking since probable cause existed for the taking. There was no need to consider the issue of implied consent absent a finding of probable cause.

We are now faced for the first time with the issue as to whether, under section 1547(a)(2), blood may be taken solely because of the implied consent provision and without the existence of probable cause in terms of physical appearance or odors of alcohol. The majority draws a bright line at the

point where probable cause did not exist, holding that the implied consent provisions are unconstitutional to the extent that a probable cause requirement is not contained therein or read into the statute.

In making this leap, the majority ignores a primary rule in examining the constitutionality of a statute, which is that to the extent possible, we must find in favor of the constitutionality of a statute. *Com., Dept. of Transp. v. McFarren,* 514 Pa. 411, 525 A.2d 1185 (1987). It is clearly evident that the legislature did not intend to have a probable cause requirement be the triggering condition to a warrantless and nonconsensual search in order to obtain a blood sample.[2] Neither did the legislature intend to violate the constitution. *See* 1 Pa.C.S. § 1922(3). In reviewing this section, it is necessary to look at the legislative plan furthering a governmental interest in obtaining an important result, despite the reduction of the right of private individuals to a warranted and probable cause search and seizure. I believe the legislative plan is clearly apparent and the rationale for such a plan is reasonable and necessary.[3]

**2.** While the Commonwealth would have us find that the search was consensual as appellant gave actual consent to the test, I am willing to adopt the majority's view and that of the trial court that the consent, if uninformed and *unconstitutional* because of lack of probable cause, was a nullity. *Commonwealth v. Monahan,* 378 Pa.Super. 623, 549 A.2d 231 (1988).

Evidence such as blood tests are not testimonial in nature and consequently fall within the ambit of the fourth amendment, not the fifth amendment. Thus the *Miranda* warnings have no significance as to the voluntariness of the blood test, or the coerciveness implied by failing to warn a driver. *Also see Commonwealth v. Anderl,* 329 Pa.Super. 69, 477 A.2d 1356 (1984) (breathalyzer results). Also, no *Miranda* waiver is required where the appellant is not taken into custody. *Pennsylvania v. Bruder,* 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988); *Commonwealth v. Gonzalez,* 519 Pa. 116, 546 A.2d 26 (1988); *Commonwealth v. Britcher,* 386 Pa.Super. 515, 563 A.2d 502 (1989). *Also see Commonwealth v. Ellis,* 379 Pa.Super. 337, 549 A.2d 1323 (1988), allocatur denied, 522 Pa. 601, 562 A.2d 824 (1989) (defendant not in custody when questioned in his hospital room).

**3.** The statutory construction act, 1 Pa.C.S. § 1901 *et seq.,* provides:

§ 1921. Legislative intent controls

. . . .

All of the reasons enunciated in *Skinner* as to the right of government to effectuate regulations to control an instrumentality which contains the prospect of great danger and harm to the public, by both deterrence and sanctions, are applicable here. The United States Supreme Court reviewed and documented the necessity to impose special treatment on employees of railroads, due to the numbers and kinds of accidents which are engendered when employees are under the influence of drugs or alcohol. That documentation is no less relevant and applicable to operators of motor vehicles, whether they be private vehicles such as the automobile in this case, or buses carrying large numbers of people, or trucks carrying an enormous array of products, some of which are extremely lethal and toxic, capable of damaging large areas and entire communities, or heavy transports carrying bridge beams and heavy equipment, which travel the hills of Pennsylvania and are capable of death and destruction over large areas if not properly controlled. The potential for harm on the highways of Pennsylvania, which is one of the most extensive highway systems in the world and one which involves tunnels, bridges, mountain roads, narrow passages, fog, ice, snow and rainy conditions, is so necessary of regulation as to go without question. It appears the potential for death, destruction and great public harm is far exceeded by the vehicle traffic on the Pennsylvania highways than is the case with the railroad system in this state. It is unquestionably necessary to assure that people, who are incompetent to drive because of drug and alcohol use and who, by

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:
  (1) The occasion and necessity for the statute.
  (2) The circumstances under which it was enacted.
  (3) The mischief to be remedied.
  (4) The object to be attained.
  (5) The former law, if any, including other statutes upon the same or similar subjects.
  (6) The consequences of a particular interpretation.
  (7) The contemporaneous legislative history.
  (8) Legislative and administrative interpretations of such statute.

their illegal use, dramatically increase the dangerousness and lethalness of the vehicle which they drive, are regulated. There cannot be any question about the necessity of adequate statutory provisions to prevent, deter and sanction those people who abuse this privilege to drive and then defy the regulations.

Thus a balancing test which the majority has refused to apply, if related to the privacy concerns of the individual as compared with the general governmental interest in this area of the law, clearly mandates, in a very narrow and restricted way, an application which favors the governmental interest. As we have said before, the intrusion by tests relating to the use of alcohol or drugs has been considered minimal by both the United States Supreme Court and the Courts of this Commonwealth. The statutory scheme which equates the privilege of driving to an implied assent to drive legally and without the use of alcohol is not an unreasonable one. The statutory scheme is also a measured scheme in which the intrusion is limited to the degree necessary in order to provide the maximum effectiveness in protecting the public while at the same time minimally intruding into the private interest.

Reviewing the statutory scheme, it is evident the legislature intended that under the implied consent law, a person who obtains a driver's license and drives on the public highways gives up his right to a warranted search and seizure of blood, urine or breath samples, under 75 Pa.C.S. § 1547(a), if, prior to arrest, probable cause exists and an officer believes the driver is under the influence of drugs or alcohol. Under those conditions, a sample of blood, breath or urine could be taken without a warrant and without consent. *See Quarles, supra.* This section has been interpreted to mean, as discussed above, that probable cause must exist to believe a person is under the influence.

However, this applies only to those cases when a person is on the highway and no accident resulting in injury or death is at issue. The law thereby establishes a minimal intrusion where the need is not established to go further.

However, in the "implied consent" provision of the Motor Vehicle Code, 75 Pa.C.S. § 1547(a)(2), the legislature recognized that when a person is injured to the degree of needing medical attention or a death occurs as a result of an vehicular accident, the ultimate condition to be prevented or deterred exists and this requires, as a governmental interest and public concern, the right to go further and mandates testing both for the purpose of deterrence and for the purpose of sanctions.

The greater danger and greater harm having been realized in actuality, the implied consent law goes further than subsection (a)(1) and eliminates the requirement of probable cause. A further reason for doing so is easily evident. If a party is injured in the accident and before the police can or perhaps should go further in evaluating that party's condition to establish probable cause, he may have been transported to a hospital for treatment. By the time the police obtain an opportunity to deal with that person to ascertain whether probable cause for testing exists, the basis for ascertainment of probable cause may have dissipated. If for medical reasons the party was totally beyond contact of the police in the conduct of their investigation when there was a serious injury and the police were not able to observe the individual or to smell the odors of alcohol prior to the time the alcohol dissipated from the person's system, then the person would escape the review that any other person, who might have been under the influence of drugs or alcohol, is subjected to by the implied consent laws. There is no better example of the above than the companion case of *Commonwealth v. Kohl*, 395 Pa.Super. 73, 576 A.2d 1049 (1988), which the majority also decided, under the reasoning it propounds here, on the unconstitutionality of 75 Pa.C.S. § 1547(a)(2). There, in an early morning accident, appellant/driver was rendered unconscious and his two passengers were killed. He was hospitalized and did not regain consciousness until the following day. After investigating the scene of the accident, police went to the hospital and requested a blood alcohol test, which estab-

lished a blood alcohol content of .15 per cent. A motion to suppress this test result, on the basis of a fourth amendment right, was denied. In reversing the conviction, the majority makes it impossible for the Commonwealth to pursue a party who, through his knowing illegal behavior, has produced death and destruction, simply because his medical condition does not permit a finding of probable cause to test.

As stated above, the intrusion in terms of obtaining blood, urine or breath for the purpose of the test has been determined in *Skinner* and in other cases to be minimal. The goal to be achieved is the deterrence of uncontrolled and incompetent drivers by assuring that after the fact, there will be no escape from accountability when *injury* or *death* occurs *in an accident in which the abuser was involved.*

This governmental interest is much greater than the minimal intrusion resulting to the individual. This is a special necessity situation for which neither a warrant for arrest nor probable cause can be justified when the balance between the public and governmental interest and the private interest are weighed. When more persons are killed on our public highways each year than are killed in most of the wars in which this country has participated and the only effective weapon to reduce the carnage on the highways is by screening those persons who have ingested drugs or alcohol while driving or who have been involved in serious accidents while under the influence, then the right of the individual to be tested without probable cause being shown is far less than the need of the public to have the tests performed.[4]

I would affirm the judgment of sentence.

BROSKY, J., joins.

---

**4.** *Commonwealth v. Leninsky,* 360 Pa.Super. 49, 519 A.2d 984 (1986), discusses the role of governmental interest in preventing and controlling the extensive harm caused by irresponsible drivers. " 'The carnage caused by drunk drivers is well documented and needs no detailed recitation here.' *South Dakota v. Neville,* 459 U.S. 553, 558,

38

KELLY, Judge, dissenting:

I respectfully dissent. I would affirm judgment of sentence imposed for appellant's conviction of drunk driving. I would not address the constitutionality of 42 Pa.C.S.A. § 1547(a)(2), as I find that appellant's *express* consent was voluntary and valid, and so would find recourse to statutory *implied* consent unnecessary to uphold the search (by blood test) challenged here. Nonetheless, as the majority base their disposition of this appeal on that ground, I shall commence my dissent by explaining my views on the *implied* consent issue, before proceeding to explain, at length, why I disagree with the majority on the critical issue of whether appellant's *express* consent was voluntary and valid.

## I.  *Constitutionality of 75 Pa.C.S.A. § 1547(c)*

As enacted, the current implied consent statute leaves *unfettered discretion to the officer in the field* to determine whether or not to invoke implied consent and request that a conscious driver submit to a blood test or direct that the test be performed on an unconscious driver. 75 Pa.C.S.A. § 1547(a)(2). While every driver who falls within the triggering language of the statute is deemed to consent, there is no requirement that every driver deemed to consent be tested. Rather, the officer in the field may pick and choose which to test on an entirely ad hoc basis. The absence of sufficient restrictions on the officer's discretion as to *which* conscious drivers are to be requested to submit to a blood test, or *which* unconscious drivers are to be subjected to a blood test, renders the implied consent provision unconstitutional, even if a mandatory "request or sub-

103 S.Ct. 916, 919, 74 L.Ed.2d 748 (1983). 'The slaughter on the highways of our Nation exceeds the death toll of all our wars.' *Perez v. Cambell,* 402 U.S. 637, 657, 91 S.Ct. 1704, 1715, 29 L.Ed.2d 233 (1971) (Blackmun, J., concurring). In the past decade, over 250,000 people have died in alcohol related accidents. Each year, 708,000 people are injured, 74,000 seriously.... From 1972 to 1981, the number of alcohol related fatal accidents in Pennsylvania increased 154%. It would be feckless to argue that the Commonwealth's interest in ending the carnage is less than paramount." *Id.* 360 Pa.Super. at 57, 519 A.2d at 988–89 (footnote omitted).

mit" provision applicable to *all* such drivers could pass constitutional muster. *Cf. Florida v. Wells,* —— U.S. ——, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) (1990 WL 43473); *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Commonwealth v. Tarbert,* 517 Pa. 277, 535 A.2d 1035 (1987); *Commonwealth v. Swanger,* 453 Pa. 107, 307 A.2d 875 (1973); *Commonwealth v. Leninsky,* 360 Pa.Super. 49, 519 A.2d 984 (1986). Hence, I agree that the current statute is unconstitutional.

I do not find it necessary here to determine if the rationale of "special need" to preserve highly evanescent evidence of blood alcohol content at the time of a serious train accident *via* warrantless, suspicionless blood testing of train crews for non-criminal prosecution, regulatory purposes in *Skinner v. Railway Labor Executive Assn.,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), could be extended to permit warrantless, suspicionless blood tests of drivers involved in serious automobile accidents for criminal prosecution purposes. Nonetheless, in response to the majority's broad prohibition, I note that I would be inclined to agree with Judge Tamilia that the rationale in Skinner should be extended to cover implied consent cases, provided the officer's discretion, as to which persons (deemed to have consented) would be tested, was regulated in a rational and systematic manner.

## II. *State Constitutional Grounds*

For the same reason that I would find the statute unconstitutional under the Fourth Amendment, I would likewise find it unconstitutional under Pa. Const. Art. I, sec. 8. I cannot agree, however, with the majority's suggestion that 75 Pa.C.S.A. § 1547(a)(2) is invalid because of a heightened protection provided under Pa. Const. Art. I, sec. 8 which is not provided under the Fourth Amendment.

In *Commonwealth v. Shaeffer,* 370 Pa.Super. 179, 536 A.2d 354 (1987) (allocatur granted), this author explained in dissenting from a similar conclusion by the majority of that en banc panel that our state constitution imposed broader restrictions than the Fourth Amendment:

A.

As the majority notes, the Pennsylvania proscription against unreasonable searches and seizures antedates the federal provision. Majority Opinion, *supra,* 370 Pa.Super. at 192–194, 536 A.2d at 361. Indeed, each of the guarantees contained in the federal Bill of Rights had its antecedents in one or more of the state constitutions and colonial charters. *See generally* S. Fisher, *The Evolution of the Constitution of the United States* (Philadelphia 1897). "Far from being the model of the states, the federal Bill of Rights was added to meet demands for the same guarantees against the new central government the people had secured against their own local officials." Linde, *First Think First, Rediscovering the State's Bill of Rights,* 9 U.Balt.L.Rev. 379, 381 (1980). Eight of the thirteen original states adopted a state constitutional prohibition against unreasonable searches and seizures prior to the adoption of the Fourth Amendment. See Cuddihy, "Fourth Amendment (Historical Origins)," in 2 *Encyclopedia of the American Constitution* 762 (Levy ed. 1987); *see also* S. Fisher, *supra* at 199–201. Moreover, it is appropriate to note that from 1776 until 1949 when the Fourth Amendment was first applied to the states via the Fourteenth Amendment, the proscription against unreasonable searches and seizures in the Pennsylvania Constitution, and not the Fourth Amendment, protected Pennsylvanians from unreasonable searches and seizures by state law enforcement personnel. *Commonwealth v. Bruno,* 203 Pa.Super. 541, 201 A.2d 434 (1964); *Commonwealth v. Rubin,* 82 Pa.Super. 315, 319 (1923); *accord* Woodside, *Pennsylvania Constitutional Law,* at 116 (1985).

Clearly, Pa. Const. Art. I, sec. 8 has identity and vitality separate and distinct from that of the Fourth Amendment; it remains therefore emphatically the province and duty of the Pennsylvania judiciary to declare its scope and limitations. *See Commonwealth v. DeJohn, supra,* 486 Pa. at 44, 403 A.2d at 1289; Beck, *Pennsylvania*

*Supreme Court Review—1982,* 56 Temple Law Quarterly 705, 708-10 (1983); Roberts, *The Supreme Court of Pennsylvania; Constitutional Government in Action,* 54 Temple Law Quarterly 403, 411 (1981); *see also* Brennen, *The Bill of Rights and the States: The revival of State Constitutions as Guardians of Individual Rights,* 61 N.Y.U.L.Rev. 535 (1986); Galie, *The Other Supreme Courts: Judicial Activism Among State Supreme Courts,* 33 Syracuse L.Rev. 731 (1982).

However, even proponents of "new federalism" recognize that the case for an independent role for state courts "should not be read as a case for unthinking activism. No judge, state or federal, is a knight errant whose only concern is to do good. Hence, the state judge, when presented with the invitation to develop a body of state constitutional law, should pause to consider some of the dangers along the way." Howard, *State Courts and Constitutional Rights in the Day of the Burger Court,* 62 Va.L.Rev. 873, 940-41 (1976) (also coining the phrase "new-federalism" to describe the use of state sovereignty to insulate state constitution protections broader than the federal constitutional protections from review in the federal courts); *cf.* Berger, *New Theories of Interpretation: The Activists' Flight from the Constitution,* 47 Ohio St.L.J. 1 (Winter 1986) (analyzing and criticizing the activist approaches).

As the majority recognizes, we are "expected to deal carefully with a Supreme Court opinion and to explain forthrightly why [we find ourselves] required to reason differently." Majority Opinion, *supra,* 370 Pa.Super. at 189-190, 536 A.2d at 359, *quoting Commonwealth v. DeJohn, supra,* 486 Pa. at 44, 403 A.2d at 1289. Moreover, it should be noted that the recognition of a higher standard for searches and seizures under state constitutional law than that required under federal constitutional law in one set of circumstances, does not require that a higher standard should be imposed in all other circumstances. In *Commonwealth v. Gray,* 509 Pa. 476, 503

A.2d 921 (1985), our Supreme Court explained, "[w]hile we can interpret our own constitution to afford defendants greater protections than the federal constitution does, see e.g., *Commonwealth v. Sell,* 504 Pa. 46, 63–64, 470 A.2d 457, 467 (1983) (collecting cases), *there should be a compelling reason to do so.*" 509 Pa. at 484–85, 503 A.2d at 926. (Emphasis added).

### B.

Pennsylvanians undoubtedly have the right to adopt a state constitution which provides greater limitations on the warrantless use of electronic participant monitoring by law enforcement personnel than the federal constitution provides. The question in the instant case, however, is not whether Pennsylvanians may, but whether we have already done so.

The mere fact that Pa. Const. Art. I, sec. 8 antedates the Fourth Amendment does not provide a reason to construe it differently than the Fourth Amendment. Both were directed toward eliminating the same evils—general warrants and writs of assistance. *See Wakely v. Hart,* 6 Binn. 316, 317–18 (1814); *Commonwealth v. Rubin, supra,* 82 Pa.Super at 319–20; *see also* V *The Founder's Constitution* 219, 219–44 (tracing the origins of the Fourth Amendment); Galloway, *Fourth Amendment Ban on General Searches and Seizures,* 10 Search and Seizure L.Rep. 141, 141–48 (1983); Marke, "The writs of Assistance Case and the Fourth Amendment," in *Essays in Legal History in Honor of Felix Frankfurter,* at 351–72 (Forkosch ed. 1966); White, *Commentaries on the Constitution of Pennsylvania,* at 157–59 (Philadelphia 1907).

Moreover, there are no significant textual differences which would provide a reason for differing construction of the clauses. *Commonwealth v. Gray, supra,* 509 Pa. at 485–86, 503 A.2d at 926; *see also Commonwealth v. Johnston,* 515 Pa. 454, 472, 530 A.2d 74, 83 (1987) (Hutchinson, J., concurring); *Commonwealth v. Platou,* 455 Pa.

258, 266 n. 11, 312 A.2d 29, 34 n. 11 (1973), *cert. denied* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *compare* U.S. Const.Amend. 4 *and* Pa. Const. Art. I, sec. 8. Indeed, the revision of the Pennsylvania Constitution of 1776 in 1790 *significantly reduced textual differences* which might otherwise have supported a broader construction of the Pennsylvania provision than the federal provision. It is significant that these changes were made unanimously and contemporaneously with the ratification of the Fourth Amendment by Pennsylvania.

536 A.2d at 382–84 (footnotes omitted). *See Commonwealth v. Rodriquez,* 519 Pa. 415, 548 A.2d 1211 (1988) (construing Pa. Const. Art. 1, sec. 8 in accordance with Fourth Amendment precedent); *Commonwealth v. Reese,* 520 Pa. 29, 549 A.2d 909 (1988) (same); *Commonwealth v. Blystone,* 519 Pa. 450, 549 A.2d 81 (1988) (same; overruling *Commonwealth v. Shaeffer, supra* ); *aff'd* — U.S. —, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990).

That our federal system permits states to provide broader restrictions on the government's authority to conduct searches and seizures than minimally required by the Fourth Amendment is unquestioned. Here, however, the majority has provided no basis in the text of our constitution, the history of its application for over 175 years before *Mapp v. Ohio,* or in its history since, which would justify the expansive construction of Pa. Const. Art. I, sec. 8 employed by them here. Indeed, the majority's decision on this point is announced, rather than explained.

In absence of a clearly defined and compelling rationale based upon the text or history of Pa. Const. Art. I, sec. 8, I will continue to scrupulously avoid construing that provision to provide greater restrictions than imposed by the Fourth Amendment. I will do so especially with regard to the suppression of otherwise admissible evidence, as the exclusionary rule was *imposed* upon our settled state constitutional jurisprudence *(which had repeatedly, expressly, and unequivocally rejected the exclusionary rule* ) by the *mandate* of the Fourth Amendment, the Fourteenth

Amendment and the federal constitution's Supremacy Clause. I find no textual or historical basis for a *state* constitutionally based exclusionary rule in Pennsylvania, and I will apply such an exclusionary rule no further than our Supreme Court expressly commands. *See Commonwealth v. Shaeffer*, 370 Pa.Super. 179, 235–40 & 267–69, 536 A.2d 364, 382–85 & 398–99 (1987) (Kelly, J., concurring and dissenting) (allocatur granted); *see also Commonwealth v. Williams*, 390 Pa.Super. 493, 498, 568 A.2d 1281, 1285–87 (1990); *Commonwealth v. Haggarty*, 388 Pa.Super. 67, 73–76, 564 A.2d 1269, 1272–73 (1989) (Kelly, J., concurring); *Commonwealth v. Slaton*, 383 Pa.Super. 301, 343, 556 A.2d 1343, 1363–64 (1989) (Kelly, J., concurring and dissenting); *Commonwealth v. Melson*, 383 Pa.Super. 139, 150, 556 A.2d 836, 841 (1989) (Kelly, J., dissenting).

### III. *Express Consent*

The majority find that appellant's voluntary consent to the blood test was invalid. They do not find her consent invalid because she was coerced, or even because she was deceived. Rather, they find her consent invalid because she "was not put on notice of the possible criminal ramifications of the blood test." Majority Opinion, *supra*, 395 Pa.Superior Ct. at 27, 576 A.2d at 1026. For several reasons which I shall discuss at length, I cannot agree.

In *Commonwealth v. Slaton, supra*, this author examined the relevant law of consent, at length, as follows:

Early cases involving consent to search contained language which suggested that consent must be knowing and intelligent, *i.e.* made with full and express knowledge of the right to refuse consent. *See Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). However, in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), our Supreme Court held that valid consent is established by demonstrating that it was given voluntarily, *i.e.* without coercion express or implied. Subsequent decisions have reinforced the ruling in *Schneckloth* that

the prosecution need not establish that the party giving consent knew that consent could be refused. *See United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

Early cases were also construed to provide that consent obtained by stealth, deceit, or misrepresentation was invalid. *See Commonwealth v. Wright*, 411 Pa. 81, 190 A.2d 709 (1963), *citing Amos v. United States*, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921), *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), and *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The *Wright dictum* was followed by this Court in the more recent cases of *Commonwealth v. Poteete*, 274 Pa.Super. 490, 418 A.2d 513 (1980) and *Commonwealth v. Morgan*, 353 Pa.Super. 463, 510 A.2d 754 (1986) (citing *Poteete* ). The majority herein would also rely on the *Wright dictum* as stated in *Poteete*. Their reliance is misplaced.

Subsequent to *Amos, Gouled,* and *Weeks,* the United States Supreme Court has repeatedly upheld consensual searches as valid despite deception as to the identity and/or the purpose of the person conducting the "search." *See United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (*plurality* ); *Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Rathburn v. United States*, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). Thus, the United States Supreme Court has expressly recognized that deception does not invariably vitiate consent.

Likewise, more recent cases of our Supreme Court demonstrate that the broad *Wright dictum* (that consent acquired by deception is invalid) does not accurately state the law of consent as it is currently understood in Pennsylvania. In *Commonwealth v. Morgan,* 517 Pa. 93, 534 A.2d 1054 (1987), our Supreme Court reversed the decision of a divided panel of this Court which had held that a suspect's consent for a police officer to enter (by stating "come on in") was rendered invalid by the officer's deception as to his identity (by answering "Joe" to the suspect's question "who's there"). In *Commonwealth v. Albrecht,* 510 Pa. 604, 603, 511 A.2d 764 (1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987), our Supreme Court held that a suspect's consent to search the trunk of his car was valid despite the fact that the uniformed officers did not inform the suspect that they knew from prior lawful observations that incriminating evidence was located in the trunk. Finally, in *Commonwealth v. Brown,* 437 Pa. 1, 261 A.2d 879 (1970), our Supreme Court held that a uniformed police officer's deception as to the reason for wanting the suspect's gun did not render the suspect's consensual relinquishment of the gun invalid. In *Brown,* after citing *Wright* and acknowledging subsequent federal Supreme Court cases eroding the basis for the broad *dictum* set forth in Wright, our Supreme Court concluded:

> It is not necessary for this Court to determine what deceptive devices are improper in light of *Lewis, Hoffa* and *Lopez* although that is a very difficult question as the United States Supreme Court seems to have granted broad powers to the police. *The Supreme Court, 1966 Term,* 81 Harv.L.Rev. 112, 191–4 (1957). It is enough to state that in light of those three United States Supreme Court decisions, the police officer's (Petrovich) tactics were constitutional, and the court below properly refused to suppress evidence of the gun, holster and bullets.

261 A.2d at 883. Thus, our Supreme Court has expressly recognized that deception does not invariably vitiate consent.

This Court, too, has retreated from the broad proscription in *Wright,* and has recognized that consent may be valid despite deception as to an officer's identity and/or motivation in obtaining a suspect's consensual relinquishment of privacy with respect to statements, contraband or other inculpatory facts or evidence.

Subsequent to our Supreme Court's decision in *Brown,* this Court stated in *Commonwealth v. Weimer,* 262 Pa.Super. 69, 396 A.2d 649 (1978), that, "stealth and strategy are necessary weapons in the arsenal of the police officer." We found in *Weimer* that consent to enter a private hunting club was not invalid despite the officer's deception as to their identities and their reasons for seeking entry. In *Commonwealth v. Poteete, supra,* this Court citing *Wright* but not *Brown,* held that consent to enter the suspect's home was invalid when the officer deceived the suspect by letting the suspect think that the officer was there to follow-up on the suspect's stolen car report, when the officer was actually there to confirm his suspicion that property lawfully observed on a prior visit was in fact recently stolen property.

However, two months later in *Commonwealth v. Morrison,* 275 Pa.Super. 454, 418 A.2d 1378 (1980), *cert. denied sub nom. Morrison v. Pennsylvania,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981), an *en banc* panel of this Court held that a landowner's consent to enter a barn in which large quantities of marijuana were suspected to have been stored was not rendered invalid by the officer's deception as to both his identity and his reason for wanting to see the barn. The *en banc* panel, without citing *Brown* or *Poteete,* expressly distinguished *Wright* as having been decided on the basis of federal precedent which had subsequently been substantially modified. 418 A.2d at 1381.

48

In *Commonwealth v. Schaszberger*, 285 Pa.Super. 586, 428 A.2d 200 (1981), consent to enter was deemed valid despite the fact that it was obtained by deception as to the officers' identity and reason for seeking entry, *i.e.* in order to facilitate the safe and effective execution of a lawful search warrant. In *Commonwealth v. Ginter*, 289 Pa.Super. 9, 432 A.2d 1024 (1981), consent to enter was deemed valid despite the officers' deception as to their identities and their reason for seeking entry, *i.e.* to confirm suspicions of liquor law violations. In *Commonwealth v. Markman*, 320 Pa.Super. 304, 467 A.2d 336 (1983), a panel of this Court stated unequivocally, "[c]onsent may be deemed voluntary even when procured by a police officer who misrepresents both his identity and purpose for making the search." As noted previously, this Court's decision in *Commonwealth v. Morgan*, which ignored *Morrison, Schaszberger*, and *Ginter* and instead relied on *Poteete*, was reversed by our Supreme Court Finally, in *Commonwealth v. Carelli*, 377 Pa.Super. 117, 546 A.2d 1185 (1988), following a review of a majority of the foregoing cases, this Court held that neither *Wright* nor *Poteete* correctly stated the law regarding the effect of deception on consent as it is currently understood in Pennsylvania. I remain of that opinion.

In resurrecting *Poteete*, the majority herein offer three distinct justifications. I find each fatally flawed.

First, the majority attempts to distinguish *Carelli* based upon the presence in this case of a statutory duty on the part of the officers to state the purpose of their inspections. As explained above, I find that the statute requires no more than a statement of the type of authorized administrative inspection the officer intends or requests consent to conduct. Because the officer is not required by statute to disclose the reasons for seeking the inspection, this case is not distinguishable in that respect. Second, the majority attempts to distinguish this case based upon their conclusion that the cases cited in *Carelli*, "were primarily cases involving undercover agents in

fact situations uniquely suited to such police tactics; *e.g.* illegal narcotics dealings and illegal gambling operations." Majority Opinion, *supra*, 383 Pa.Super. at 311, 556 A.2d at 1347 n. 6. While *Morgan, Ginter, Schaszberger, Morrison,* and *Weimer* arguably fit the restriction on the permissible use of deception which the majority suggests; *Albrecht, Brown,* and *Carelli* do not.

*Albrecht* involved an uniformed officer investigating an arson case. *Brown* involved an uniformed officer investigating a murder case. *Carelli* involved an uniformed officer investigating a stolen truck case. Significantly, our Supreme Court explained in *Brown:*

> The problem for this Court is to determine the permissible extent of police power in light of these United States Supreme Court decisions. *Lewis* (involving sales of marijuana to a federal narcotics agent), *Hoffa* (involving the planting of a government informer in defendant's hotel room to overhear conversations), and *Lopez* (involving an attempted bribe of an Internal Revenue agent) clearly do not require the police to be completely open and truthful as to their identity and purpose when dealing with suspects. They recognize that undercover work is an essential weapon in the police arsenal. In this case the 'undercover' work was not as to Petrovich's identity as a policeman but rather as to his motives in offering to sell the gun. It appears to us that there is no real difference between this deception and those found permissible in *Lewis, Hoffa* and *Lopez.*

261 A.2d at 881–82. (Emphasis added). Thus, this case is not distinguishable from *Albrecht, Brown* or *Carelli* based upon the fact that the officers involved here were not working undercover, nor is this case distinguishable based upon the type of crime under investigation.

Third and finally, the majority suggest that because *Wright* has never been expressly overruled, *Poteete* and not *Carelli* correctly states the law with respect to the effect of deception upon consent in Pennsylvania. As

explained in *Carelli,* however, *Wright* was decided by our Supreme Court based solely on federal law which was subsequently substantially modified. Moreover, subsequent decisions of our Supreme Court, while not overruling *Wright* expressly, have nonetheless expressly recognized this change in the law. *See Commonwealth v. Morgan, supra; Commonwealth v. Albrecht, supra; Commonwealth v. Brown, supra.* Thus, I remain of the opinion that *Wright* and *Poteete* no longer correctly state the controlling law, and that they were properly distinguished in *Morrison* and *Carelli.*

Of course, consent remains invalid if it is given in response to a false or invalid claim of authority. *See Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); *Bumper v. North Carolina* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Go–Bart Importing Co. v. United States* 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931). Likewise, consent is exceeded when the scope of the search actually conducted is broader than that to which the individual has consented. *See Gouled v. United States, supra; Commonwealth v. Shaw,* 467 Pa. 543, 383 A.2d 496 (1978); *see generally* III FaFave, *Search and Seizure* § 8.1(c), at 160–174 & nn. 48–108. Whether other types of deception vitiate consent must depend upon a case by case determination of the voluntariness of the consent in light of the totality of the circumstances, including the challenged deception. *See Commonwealth v. Brown, supra,* 261 A.2d at 882; *Commonwealth v. Morrison, supra,* 418 A.2d at 1380–81. The voluntariness of consent need only be established by a preponderance of the evidence. *Bourjaily v. United States,* 483 U.S. 171, 176, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144, 153 (1987); *United States v. Matlock, supra.*

556 A.2d at 1358–61 (footnotes omitted).

In the instant case, appellant was involved in an auto accident. Appellant had driven her car into a telephone pole at a high rate of speed; her passenger was killed in the crash. When interviewed by the officer, appellant ex-

plained that she had met her passenger earlier that evening at an Inn, and that the accident was caused by her passenger's sudden attempt to sexually assault her while she was driving. The investigating officer asked if she would consent to a blood alcohol test. He informed her that the result of that test would be used in his investigation of the accident. He further informed her that she was *not* under arrest, and that he was not charging her with any crime at that time.

The majority finds that appellant's consent was not *"voluntary"* because it was not *"knowingly and intelligently"* given. The majority reaches that conclusion based upon its determination that, "appellant had no reason to believe that the investigation was any different from a routine accident investigation," and "appellant was not put on notice of the possible criminal ramifications" of her consent. Majority Opinion, *supra*, at 21. Neither, however, had the defendants in *Morgan, Albrecht, Brown, Carelli, Morrison, Ginter, Schaszberger, or Weimer* been "put on notice of the possible criminal ramifications" of their *consent* to search; yet, consent was deemed voluntary and valid in each of *those* cases.

Here, there was no coercion and no deception. Appellant voluntarily consented to take the test, and the voluntarily submitted to the test. There is no semblance of official coercion express or implied; consequently, I see no grounds to deem the consent invalid. There is no requirement that consent to search be "knowing and intelligent" as well as "voluntary." *See United States v. Watson, supra; United States v. Matlock, supra; Schneckloth v. Bustamonte, supra.*

### IV. *"Intelligent" Waivers*

In point of fact, the majority has improperly injected Fifth Amendment "knowing and intelligent" waiver analysis into a Fourth Amendment "voluntary" consent case. Moreover, in doing so, they fail to observe the existing limitations on that waiver analysis generally, and on the intelligent waiver component particularly.

The prophylactic *Miranda* warnings are only deemed to be required to protect Fifth Amendment rights when the suspect is subjected to presumptively coercive interrogation while in police custody. *See Pennsylvania v. Bruder*, 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988); *Commonwealth v. Gonzalez*, 519 Pa. 116, 546 A.2d 26 (1988); *Commonwealth v. Britcher*, 386 Pa.Super. 515, 563 A.2d 502 (1989); *Commonwealth v. Ellis*, 379 Pa.Super. 337, 549 A.2d 1323 (1988). Though the majority are willing to import the "intelligent choice" waiver approach from Fifth Amendment, custodial interrogation, confession cases into this Fourth Amendment, non-custodial, consent to search case, they are apparently unwilling, however, to import as well the limitation that voluntary, *knowing, and intelligent* waivers are *only* required when the suspect is in the *presumptively coercive* setting of police custody. It is entirely undisputed in this case that *appellant was not in custody when she consented to take the blood test.* Thus, the very application of voluntary, knowing, and intelligent waiver analysis in this *non-custodial* context is a significant expansion of *Miranda's* progeny. I find no legitimate basis for that expansion, as there is no history of third degree type coercion by police to secure consent to blood test during non-custodial investigative detentions following auto accidents, which would warrant the requirement of *Miranda*-type prophylactic warnings regarding Fourth Amendment rights. *Cf. Commonwealth v. Slaton, supra,* 556 A.2d at 1363–64.[1]

---

1. I explained this position in *Commonwealth v. Slaton, supra,* as follows:

Whether and to what extent there may be a state exclusionary rule in Pennsylvania arising from the Pennsylvania Constitution is uncertain in Pennsylvania. *See Commonwealth v. Montgomery*, 513 Pa. 138, 142–43, 518 A.2d 1197, 1199 (1986); *Commonwealth v. Shaeffer*, 370 Pa.Super. 179, 265–71, 536 A.2d 354, 398–400 (1988) (Kelly, J., concurring and dissenting. In *Commonwealth v. Morgan, supra,* our Supreme Court noted:

[E]xclusion/suppression of evidence is not an appropriate remedy for every violation of the Pennsylvania Rules of Criminal Procedure concerning searches and seizures. It is only where the violation also implicates fundamental, constitutional concerns, is conducted

Moreover, in applying the "knowing and intelligent" waiver analysis, the majority have given the "intelligent" waiver component broader construction that is permissible is even true Fifth Amendment/*Miranda* cases. Concededly, the majority applies an "intelligent choice" approach which had been applied to cases involving *Miranda* waivers in this Commonwealth is varied forms since our Supreme Court's decision in *Commonwealth v. Collins*, 436 Pa. 114, 259 A.2d 160 (1969). Notwithstanding the line of Pennsylvania Supreme Court cases from *Collins* to *Commonwealth v. Moss*, 518 Pa. 337, 543 A.2d 514 (1988) applying some form of that approach, I nonetheless conclude that the "intelligent choice" approach to *Miranda* waivers of the right against compulsory self-incrimination in contrary to controlling United States Supreme Court precedent on this issue of *federal* constitutional law (and is even more contrary to such precedent when extended improperly to consent to search "waivers").

in bad-faith or has substantially prejudiced the defendant that exclusion *may* be an appropriate remedy.

534 A.2d at 1056 n. 2, *quoting Commonwealth v. Mason*, 507 Pa. 396, 406–07, 490 A.2d 421, 426 (1985) (emphasis in original). In light of our Supreme Court's resolute resistance to the *federal* exclusionary rule prior to *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), I find that recognition and application of an independent state exclusionary rule by this Court would be inappropriate absent a clear command by our Supreme Court. *See Commonwealth v. Shaeffer, supra*, 536 A.2d at 399 (Kelly, J., concurring and dissenting) (discussing the prospect of a state constitutional exclusionary rule). I note that our Supreme Court has applied the *federal* exclusionary rule cautiously. In *Commonwealth v. Williams*, 454 Pa. 368, 312 A.2d 597 (1973), they explained:

A prophylactic exclusionary rule is applied only in extreme cases where all other attempts to secure compliance have proven unsuccessful. *See generally Mapp v. Ohio*, 367 U.S. 643, 651–52, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In this area there has been no showing of widespread flagrant disregard to justify formulation of such a rule at this time.

454 Pa. at 372, 312 A.2d at 600; *see also Commonwealth v. Musi*, 486 Pa. 102, 115–16, 404 A.2d 378, 384 (1979).

The same may be said here.

556 A.2d at 1363–64. (Emphasis in original). Likewise, the same may be said here.

There can be no doubt that the "intelligent choice" approach to Fifth Amendment/*Miranda* waivers which was applied in varied forms by our Supreme Court rested *exclusively* on *federal* rather than *state* constitutional law grounds. Prior to *Miranda,* our Supreme Court, applying *state* law, uniformly held that no prophylactic *Miranda* -type warnings were required, and that even confessions gained by artifice or deception were admissible unless the artifice or deception employed was of a type likely to induce a *false* confession. *See e.g. Commonwealth v. Graham,* 408 Pa. 155, 182 A.2d 727 (1962); *Commonwealth v. Johnson,* 372 Pa. 266, 93 A.2d 691 (1953); *Commonwealth v. Hipple,* 333 Pa. 33, 3 A.2d 353 (1939); *Commonwealth v. Spardute* 278 Pa. 37, 122 A. 161 (1923); *Commonwealth v. Cressinger,* 193 Pa. 326, 44 A. 433 (1899); *Commonwealth v. Goodwin,* 186 Pa. 218, 40 A. 412 (1898); *Commonwealth v. Wilson,* 186 Pa. 1, 40 A. 283 (1898).

## A. *PENNSYLVANIA CASES*

In *Commonwealth v. Collins, supra,* a plurality of our Supreme Court first adopted the "intelligent choice" approach, stating:

Appellant urges that the court erred in failing to suppress his oral statement, which he claims was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). The Commonwealth points to a 'waiver' appellant signed, setting forth the *Miranda* warnings and stating that he had read the catalogue of his rights and was willing to make a statement. Appellant replies that this 'waiver' was ineffective because it is undisputed that at the time he signed it, he had not been informed of the nature of the crime for which he was to be questioned.

In *Miranda* itself, the Court stated, at page 475, 86 S.Ct. at page 1628, 'The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but *intelligently* and *understandingly* rejected the offer. Anything less is not waiver.' (Emphasis added). High standards of proof are always re-

quired where a waiver of constitutional rights is involved. *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357 (1938). We agree with appellant that *an intelligent and understanding waiver of the right to counsel is impossible where the defendant has not been informed of the crime which is being investigated.* It is a far different thing to forgo a lawyer where a traffic offense is involved than to waive counsel where first degree murder is at stake.

259 A.2d at 162 (per O'Brian, J.; Jones and Cohen, JJ., join; Bell, C.J. and Eagen, Roberts and Pomeroy, JJ., concur in the result). (Emphasis added).

In *Commonwealth v. Richman,* 458 Pa. 167, 320 A.2d 351 (1974), Chief Justice Nix (then Justice Nix) stated in another plurality opinion:

The Commonwealth argues that even if appellant had a right to counsel at the line-up, his oral and written declarations establish that he waived that right. Appellant counters by asserting that such waiver was made without knowledge of the crime under investigation and was therefore not knowing and intelligent.

This Court has dealt with similar challenges to waivers of the right to counsel under *Miranda* on several occasions. See, *Commonwealth v. McKinney,* 453 Pa. 10, 306 A.2d 305 (1973); *Commonwealth v. McIntyre,* 451 Pa. 42, 301 A.2d 832 (1973); *Commonwealth v. Swint,* 450 Pa. 54, 296 A.2d 777 (1972); *Commonwealth v. Boykin,* 450 Pa. 25, 298 A.2d 258 (1972); *Commonwealth v. Jacobs,* 445 Pa. 364, 284 A.2d 717 (1971); *Commonwealth v. Cooper,* 444 Pa. 122, 297 A.2d 108 (1971). In each of these cases, we alluded to the decision of three members of this Court in *Commonwealth v. Collins,* 436 Pa. 114, 121, 259 A.2d 160, 163 (1969) which held that 'an intelligent and understanding waiver of the right to counsel is impossible where the defendant has not been informed of the crime which is being investigated.' *However, in each case we determined that the suspect had been adequately informed of the general nature of the charges against*

> *him.  These cases teach that while there is no need for the police to explain in detail all of the technicalities of the charges at issue, the accused should at least know the general nature of the transaction giving rise to the charges.*

320 A.2d at 354–55 (the plurality aspect of the decision appears, however, to have been limited solely to a different issue than the one considered here).  (Emphasis added).

In *Commonwealth v. Dixon*, 475 Pa. 17, 379 A.2d 553 (1977), Justice Pomeroy, speaking for a majority of the Court, explained:

> Appellant's primary contention before us is that she did not 'knowingly and intelligently' waive her constitutional rights to remain silent and to have a lawyer present during the police interrogation, and that it was therefore error to refuse her request to suppress her oral confession.  On the basis of this record, we must agree.
>
> In *Commonwealth v. Richman,* this Court held that *a valid waiver of Miranda rights requires that the suspect have an awareness of the general nature of the transaction giving rise to the investigation.  The rationale of this holding was that it is only when such knowledge is possessed by a suspect that he can be said to understand the consequences of yielding the right to counsel.* 'It is far different thing to forego a lawyer where a traffic offense is involved than to waive counsel where first degree murder is at stake.'  It is clear from *Richman,* however, that the suspect need not have knowledge of the 'technicalities' of the criminal offense involved; rather, it is necessary only that he be aware of the 'transaction' involved.  Neither does the Richman holding establish a 'fifth Miranda warning'; that is, *there is no prophylactic requirement that the interrogating officers affirmatively provide information to the suspect as to the crime under investigation.*  Where, however, the defendant has not been furnished with such information and a pre-trial challenge concerning the validity of a confession is made on this ground, *the Common-*

*wealth must prove by a preponderance of the evidence that the defendant knew of the occasion for the interrogation. This burden may sometimes be satisfied by the establishment of circumstances attending the interrogation,* such as the prior statements of the suspect, *or the fact that interrogation follows hard upon the criminal episode* and there is no circumstance lending ambiguity to the direction and purpose of the questioning.

379 A.2d at 566 (citations omitted; emphasis added).

In *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288 (1983), Justice Zappala, speaking for a majority of the Court stated:

*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) does not require that in addition to the various rights enumerated a suspect must be provided information as to the crime under investigation. This Court has held, however, that *a suspect must have 'an awareness of the general nature of the transaction giving rise to the investigation,'* in order to make an intelligent and understanding waiver of his rights. *Commonwealth v. Dixon,* 475 Pa. 17, 22, 379 A.2d 553, 556 (1977). *See also Commonwealth v. Richman,* 458 Pa. 167, 320 A.2d 351 (1974). It was stated in *Dixon* that where 'the defendant has not been furnished with such information [so as to make him aware of the transaction involved] and a pre-trial challenge concerning the validity of a confession is made on this ground, *the Commonwealth must prove by a preponderance of the evidence that the defendant knew of the occasion for the interrogation.'* 475 Pa. at 23, 379 A.2d at 556.

467 A.2d at 293. (Emphasis added).

Finally, in *Commonwealth v. Moss, supra,* Justice Zappala, again speaking for a majority of the Court, in rejecting a claim that the *Miranda* warnings should have been repeated when the police questioned the suspect regarding a second burglary, noted:

It would appear, however, that the approach suggested would greatly expand the rule of the case on which it is

premised, *Commonwealth v. Dixon*, 475 Pa. 17, 379 A.2d 553 (1977). There we invalidated a confession as the product of a waiver of rights not knowingly and intelligently given. Dixon was arrested for failure to abide by a restitution order imposed for a summary conviction, but questioned about the death of her son. Given the ambiguity of the situation, we held that the Commonwealth had not proven she had sufficient 'awareness of the *general* nature of the transaction giving rise to the investigation,' citing *Commonwealth v. Richman*, 458 Pa. 167, 320 A.2d 351 (1974). We did not hold in *Dixon*, and *we have never held, that a suspect must be informed of each and every crime under investigation. On the contrary, we have consistently held that the Commonwealth, in meeting its burden of proving a waiver was knowing and intelligent, may establish the circumstances attending the interrogation and the lack of ambiguity as to the questioning's direction and purpose.*

543 A.2d at 519 n. 1. (Emphasis added).

The underlying premise of the "intelligent choice" approach to *Miranda* waivers is that a waiver may not be deemed "intelligent" in a constitutional sense if the police have knowingly withheld information which might materially impact on the wisdom or intelligence of the choice to waive the right against compulsory self-incrimination in a tactical sense. I note that our Supreme Court's more recent cases reflect a distinct trend away from strict application of the intelligent choice approach, substituting instead a lesser requirement that, in the circumstances of the individual case, the suspect be adequately informed of "the general nature or the transaction under investigation," and *not* that the suspect be "put on notice of possible criminal ramifications." *Compare Commonwealth v. Travaglia, supra,* 467 A.2d at 293, *and* Majority Opinion, *supra,* at 21. I note further that in a cases which involved the failure of the police to inform a suspect that an individual injured in an automobile accident had died, this Court none-

theless found the suspect's *Miranda* waiver voluntary, knowing, and intelligent, and therefore valid; notwithstanding the fact that the suspect was not informed of the full potential criminal consequences of his confession. *See Commonwealth v. Gotto,* 306 Pa.Super. 434, 443, 452 A.2d 803, 807 (1982); *compare Commonwealth v. Collins, supra (plurality).*

### B. *UNITED STATES SUPREME COURT CASES*

The underlying premise of the "intelligent choice" approach to *Miranda* waivers has been traced to the United States Supreme Court's decision in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). *See generally* Medalie, *From Escobedo to Miranda, passim* (Inst. Crim.L. & Pro.1966). Professor Joseph D. Grano has cogently, albeit critically, summarized the impact of *Escobedo* on the law of confessions as follows:

### A. *Police Interrogation and Intelligent Choice*

Although *Escobedo v. Illinois* has little vitality today as a Sixth Amendment case, its reasoning, which illustrates the first strand of modern confessions thinking, still exerts influence. After the police confronted Escobedo with an accomplice who accused him of the fatal shooting, Escobedo responded that the accomplice, not he, had fired the shots. *The Supreme Court sympathetically observed that Escobedo as a layman undoubtedly was unaware that his admission of complicity was as damaging as an admission that he had fired the fatal shots. The Court stated that Escobedo needed counsel's legal aid and advice, because what resulted during the interrogation could affect the later trial. Absent the right to counsel's advice, the trial would be 'no more than an appeal from the interrogation,'* with conviction virtually assured by the suspect's confession.

We can appreciate how remarkable this reasoning is only by focusing clearly on the evils the court identified as warranting relief. *The primary evil is the suspect making an uninformed and unintelligent decision to confess. To assure an informed and intelligent decision,*

*one that comports with the suspect's best interests, counsel should be present to provide aid and advice. A second evil is the police obtaining evidence from the suspect that will help assure his conviction. The suspect will not have much chance of mounting an effective defense at trial—that is, of winning an acquittal—if he confesses, and for some reason, not articulated, this is undesirable even when the suspect is guilty.* If these concerns are legitimate, the tactics the authors advocate should have no place in our law. *Indeed, if one takes Escobedo's reasoning seriously, all police interrogation should be prohibited until the defendant has had an opportunity to consult with a lawyer.* Under *Escobedo*'s constitutional vision, we cannot rest comfortably with a system that permits the availability of legal assistance to turn on the suspect's hurried response to a less than enthusiastic police warning. Indeed, the procurement of legal advice must depend in such a system more on chance than on a reasoned exercise of judgment. Of course, as the authors and others know, provision of counsel to all defendants before interrogation would facilitate intelligent choice only by virtually eliminating the possibility of confessions, for the only advice a competent lawyer typically will give, particularly if the suspect is guilty, is not to make a statement. This, however, is the necessary price of taking *Escobedo* seriously.

Grano, *Selling the Idea to Tell the Truth,* 84 Mich.L.Rev. 662, 666–67 (1986) (footnotes omitted, emphasis added), *reviewing* Inbau, Reed, & Buckley, *Criminal Interrogations and Confessions* (3rd Ed.1986). .

Professor Yale Kamisar, however, had provided a forceful justification of the very results Professor Grano criticized, prior to the Supreme Court's decision in *Miranda:*

I do not claim that the state has an obligation to prevent a suspect from incriminating himself. I do contend that it must ensure that the suspect is aware that he need not, and cannot be made to, incriminate himself. I do not claim that the state should, or even that it can, eliminate

all the subtle and personal 'inequalities' which 'disadvantage' some subjects of police interrogation more than others. *I do contend that so far as it is reasonably possible the state can and should ensure that the choice of the weak and the ignorant and the poor to speak or not to speak is as free and as informed as that of their more fortunately endowed brethren.*

\*       \*       \*       \*       \*       \*

Suspects there are who feel in a 'pleading guilty' mood, for some of the many reasons most defendants do plead guilty. Suspects there are who would intentionally relinquish their rights for some hoped-for favor from the state. I do not deny this. I do deny that such suspects do not need a lawyer.

*Surely the man who, in effect, is pleading guilty in the gatehouse needs a lawyer no less than one who arrives at the same decision only after surviving the perilous journey through that structure.* Both needs are substantial:

An attorney is in a better position than defendant to evaluate and discuss any plea agreement. Moreover, the attorney will want to inquire about the court's sentencing practice and thus better assess the value of any proposition made by the prosecuting attorney. Under these circumstances, a defendant will have a sympathetic legal expert helping him analyze all relevant factors in arriving at the ultimate conclusion of whether to plead guilty.

*One can seriously question whether a defendant who pleads guilty should ever be admitted to waive counsel.*

\*       \*       \*       \*       \*       \*

Logical radiations from *Massiah* and *Escobedo* carry far. *Their force may not be spent unless and until all police questioning in the absence of counsel is barred.*

Kamisar, "Equal Justice in the Gatehouses and Mansions of American Criminal Procedure," in *Criminal Justice in Our*

*Time* at 10, 36 & 61 (Howard ed. 1965) (footnote omitted, emphasis added).[2]

In light of the broad constructions made by both supporters and critics of the *Escobedo* decision, it is hardly surprising that our Supreme Court construed *Miranda* to require that the suspect have at least a general awareness of the subject matter of the interrogation to be conducted before waiving his Fifth Amendment rights. Nonetheless, whether the sign posts were misread, or the United States Supreme Court simply decided that it was following the wrong path,[3] the fact remains that recent United States Supreme Court cases clearly indicate that the "intelligent choice" approach is not the correct path to follow in analyzing *Miranda* waivers under *federal* constitutional law.

Indeed, recent United States Supreme Court decisions involving the Fifth Amendment generally and *Miranda* waiversparticularly have significantly refined and in some cases altered entirely our understanding of the nature and operation of the federal constitutional proscription against compulsory self-incrimination.[4] Of particular significance

2. The *"Massiah"* case referred to by Professor Kamisar is *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

3. *Cf.* Frey, *Modern Police Interrogation Law: The Wrong Road Taken,* 42 U.Pitt.L.Rev. 731–36 (1981).

4. *See generally Balt. Dept. Soc. Serv. v. Bouknight,* 493 U.S. ——, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990) (5th Amendment did not preclude enforcement of order directing mother to produce child in her custody under an "act of production" theory); *Duckworth v. Eagan,* 492 U.S. ——, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (warnings in their totality fulfilled the mandate of *Miranda* despite differences from the traditional phrasing of the warnings); *Pennsylvania v. Bruder,* 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988) (ordinary traffic stops are not "custodial" for *Miranda* purposes); *Braswell v. United States,* 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988) (custodians of corporate records are not privileged from the "act of production" under the Fifth Amendment); *United States v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (when defense counsel argued that the government had denied the defendant a chance to explain his conduct, the prosecutor's comment on the defendant's failure to testify was a "fair response"); *Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (an isolated comment on post-arrest silence was not prejudicial error when question was not answered, an objection to it was sustained, the jury was instructed to ignore the question, and the comment was not exploited further); *Arizona v. Mauro,* 481 U.S.

to the issue presented in this case are a series of cases relating to *Miranda* waivers. These cases lead me to the conclusion that *Collins, Richman, Dixon, Travaglia* and *Moss* no longer correctly state the controlling law with respect to *Miranda* warnings and waivers of Fifth Amendment rights, thus undermining the majority's "intelligent" waiver approach as applied to Fifth Amendment Miranda cases and even more so as to Fourth Amendment consent cases.

In *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the United States Supreme Court expressly rejected the proposition that a *Miranda* waiver could not be deemed "knowing and intelligent" when the police had prevented counsel from contacting the suspect, and had falsely told counsel that the suspect would not be questioned. The Supreme Court explained:

> ... *Miranda* holds that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.'

*   *   *   *   *   *

> ... the Court of Appeals believe that the '[d]eliberate or reckless' conduct of the police, in particular their failure to inform respondent of the telephone call, fatally undermined the validity of the otherwise proper waiver. We find this conclusion untenable as a matter of both logic and precedent.

> *Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.* Under the analysis of the Court of Appeals, the same defendant, armed with the same information and confronted with precisely the same police conduct, would have knowingly waived his *Miranda* rights had a lawyer not telephoned the police

520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (permitting the suspect's wife to speak to the accused within sight and earshot of a police officer did not constitute police "interrogation").

station to inquire about his status. Nothing in any of our waiver decisions or in our understanding of the essential components of a valid waiver requires so incongruous a result. *No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.*

*Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.* 475 U.S. at 421–23, 106 S.Ct. at 1140–41, 89 L.Ed.2d at 420–22 (citations and footnotes omitted, emphasis added). Despite the fact that information material to the tactical wisdom or intelligence of the waiver had been intentionally, even fraudulently, withheld from the suspect, the *Miranda* waiver was nonetheless deemed voluntarily, knowingly, and intelligently made. *Cf. Commonwealth v. Hilliard,* 471 Pa. 318, 370 A.2d 322 (1977) (a plurality of our Supreme Court had previously reached a contrary conclusion applying their construction of the *federal* law in similar circumstances).

In *Connecticut v. Barrett,* 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the United States Supreme Court held that the suspect's partial invocation of Fifth Amendment rights (*i.e.* stating that he was willing to *talk,* but not to sign a *written* statement) did not require cessation of all questioning. The Supreme Court specifically rejected a contention that the *partial* invocation of Fifth Amendment protections demonstrated such defects in the suspect's understanding of the consequences of the *Miranda* waiver as to preclude a finding that the partial waiver was made knowingly and intelligently. The Supreme Court explained:

We also reject the contention that the distinction drawn by Barrett between oral and written statements indicates an understanding of the consequences so incomplete that we should deem his limited invocation of the right to counsel effective for all purposes. *This suggestion ignores Barrett's testimony—and the finding of the trial court not questioned by the Connecticut Supreme Court—that respondent fully understood the Miranda warnings.* These warnings, of course, made clear to Barrett that '[i]f you talk to any police officers, anything you say can and will be used against you in court.' App at 48A. The fact that some might find Barrett's decision illogical is irrelevant, for *we have never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'* 479 U.S. at 530, 107 S.Ct. at 832–33, 93 L.Ed.2d at 928–29 (footnote omitted, emphasis added). Here again, the fact that the suspect was unaware of, or misunderstood, information which might have materially affected the tactical wisdom or intelligence of his decision to waive his right against compulsory self-incrimination did not foreclose a finding that the waiver was made voluntarily, knowingly, and intelligently.

Finally, and most significantly, in *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), the United States Supreme Court expressly rejected a contention that a suspect's *Miranda* waiver could not be deemed to have been made "intelligently" even if the police intentionally failed to inform a suspect, who had been arrested for illegal sales of firearms, that they suspected him in an entirely unrelated murder and that questions relating to that incident would also be included in the questioning to be conducted if the suspect chose to waive his Fifth Amendment rights. The Supreme Court stated bluntly that, "Spring's argument strains the meaning of compulsion beyond the breaking point." 479 U.S. at 572, 107 S.Ct. at 857, 93 L.Ed.2d at 965.

The Supreme Court then explained:

A statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional privilege.

\* \* \* \* \* \*

There also is no doubt that Spring's waiver of his Fifth Amendment privilege was knowingly and intelligently made: that is, that Spring understood that he had the right to remain silent and that anything he said could be used as evidence against him. *The constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. The Fifth Amendment's guarantee is both simpler and more fundamental: a defendant may not be compelled to be a witness against himself in any respect.* The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. *The Miranda warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.*

In this case there is no allegation that Spring failed to understand the basic privilege guaranteed by the Fifth Amendment. Nor is there any allegation that he misunderstood the consequences of speaking freely to the law enforcement officials. In sum, we think that the trial court was indisputably correct in finding that Spring's waiver was made knowingly and intelligently within the meaning of *Miranda*.

479 U.S. at 573–75, 107 S.Ct. at 857, 93 L.Ed.2d at 965–66 (citations and footnotes omitted, emphasis added).

Spring further contended that even if his statements were not "compelled" in a Fifth Amendment sense, they were nonetheless the fruits of police deception in violation of the *dictum* in *Miranda* that "any evidence that the accused

was threatened, *tricked* or cajoled into a waiver will ... show that the defendant did not *voluntarily* waive his privilege." 384 U.S. at 746, 86 S.Ct. at 1629, 16 L.Ed.2d at 725. (Emphasis added).[5] In rejecting this claim, the Supreme Court stated:

Even assuming that Spring's proposed distinction has merit, we reject his conclusion. *This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of Miranda rights, and we expressly decline so to hold today.*

Once *Miranda* warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right—'his right to refuse to answer any question which might incriminate him.' 'Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled.' *We have held that a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might ... affec[t] his decision to confess.' '[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or standby his rights.' Here, the additional information could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature. Accordingly, the failure of the law enforcement officials to inform Spring of the subject matter of the interrogation could not affect Spring's decision to waive his Fifth Amendment privilege in a constitutionally significant manner.*

**5.** I note that even in *Miranda* the focus of the deception/trickery issue was on whether it vitiated the *voluntary* character of the waiver. So long as the deception/trickery does not relate to the warnings or the constitutional right itself, the knowing and intelligent aspect of the waiver is not effected.

479 U.S. at 576–77, 107 S.Ct. at 859, 93 L.Ed.2d at 967–68 (citations and footnotes omitted, emphasis added).

Though the "intelligent choice" approach was stoutly defended and extolled in Justice Marshall's dissenting opinion, the joinder of only Justice Brennan in that dissent demonstrates that the "intelligent choice" approach has been plainly and expressly rejected by a clear majority of the body which is, under our system of government, the final expositor of the *federal* Constitution. As the *federal* constitutional premise upon which *Collins, Richman, Dixon, Travaglia,* and *Moss* are built has collapsed, so too must the precedential authority of those decisions be deemed to be collapsed.[6] Finally, I note that this Court followed *Moran, Barrett,* and *Spring* in *Commonwealth v. Britcher, supra,* 563 A.2d at 507 (emphasizing that "knowing and intelligent" refer solely to the suspect's understanding of the *Miranda* warnings, and *not* the suspect's understanding of his or her tactical interests).

## III. *COULD TRICKERY INVALIDATE THE WAIVER?*

The "intelligent choice" approach has been plainly rejected. Moreover, while the Supreme Court expressly left undecided the question of what effect an *affirmative* misrepresentation by the police might have on the validity of a Miranda waiver, the Supreme Court expressly rejected the suggestion that the officer's arguably deceptive silence constituted waiver vitiating deception. *Colorado v. Spring, supra,* 479 U.S. at 576 n. 8, 107 S.Ct. at 858 n. 8, 93 L.Ed.2d at 967 n. 8. (Emphasis added).

I would hold that even when a suspect is in the presumptively coercive setting of custodial interrogation, so long as the suspect's rights are clearly explained by adequate Mi-

---

6. Though *Moss* was decided after *Spring,* it is nonetheless without precedential weight because a United States Supreme Court construction of the federal constitution supercedes all contrary constructions, and because the note in *Moss* was casual *dictum* which simply explained that even the *Dixon* and *Richman* decision would not have sustained the appellant's meritless claim in that case. There is no hint or suggestion in *Moss* that *Spring* had even been considered.

randa warnings [7] and scrupulously honored by the police, I see no possible "compulsion" arising from deception by police as to facts known or suspicions entertained. If the suspect is "tricked" into thinking that denial of guilt would be futile or that the police could be outwitted and thrown off the scent, and in the process the suspect unwittingly provides the police with inculpatory evidence, I see no legitimate Fifth Amendment interest violated. *Cf. Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed.2d 714, 718 (1977) (suspect confessed after falsely being told his finger prints were found); *Michigan v. Mosley*, 423 U.S. 96, 98 & n. 3, 96 S.Ct. 321, 324 & n. 3, 46 L.Ed.2d 313, 318 & n. 3 (1975) (suspect confessed after falsely being told that another suspect had confessed and implicated him as the trigger-man); *accord Commonwealth v. Hughes*, 521 Pa. 423, 442 n. 8, 555 A.2d 1264, 1274 n. 8 (1989) (the deception alleged would not invalidate the *Miranda* waiver, even if established). Indeed, as Professor H. Richard UViller has cogently observed, "Only the purest idealists would argue that all police deception is unacceptable and the suspect under interrogation must have a factually true and complete account of the state of the case against him to allow him to make an informed, and therefore free, choice to cooperate." UViller, *Tempered Zeal*, at 190 (1988).

When a suspect legally taken into custody, is given constitutionally adequate *Miranda* warnings and has sufficient mental capacity to understand *the warnings*, the suspect's election to voluntarily waive Fifth Amendment rights, in whole or in part, may not be deemed to have been "compelled" merely because the suspect was tricked by the police into miscalculating the tactical wisdom of his election to waive known and understood Fifth Amendment rights. Succinctly, there is a fundamental and constitutionally significant difference between a *compelled* statement and an *unwise* one. *Cf. United States v. Mendenhall*, 446 U.S.

---

**7.** *See Duckworth v. Eagan*, 492 U.S. ——, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (the language of the traditional *Miranda* warnings is not to be treated as a required talismanic incantation).

544, 555–56 & 559, 100 S.Ct. 1870, 1878 & 1880, 64 L.Ed.2d 497, 510 & 513 (1980) ("It may happen that a person makes statements to law enforcement that [the person] later regrets, but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily," and again, "the question is not whether the [person] acted in [their] ultimate self-interest, but whether [the person] acted voluntarily").

Under *United States v. Watson, United States v. Matlock,* and *Schneckloth v. Bustamonte,* no prophylactic *Miranda* -type warnings are required when an officer requests a suspect to consent to a search, regardless of whether the suspect is in police custody at the time of the request. As a corollary to the reasoning set forth above, I see no reason why police deception should vitiate consent to search, unless the police deception went to the suspect's right to deny consent to search, or the right to deny consent to search without penalty. *See Lo–Ji Sales, Inc. v. New York, supra; Bumper v. North Carolina, supra; Go–Bart Importing Co. v. United States, supra; Commonwealth v. Wright, supra.* If the police deception went only to the *purpose* of consent, for example by acting undercover, by withholding information as to existing knowledge or suspicions, or by affirmatively misleading the suspect as to the purpose of the search, and *not* to the suspect's right to decline consent without penalty, the consent would remain uncoerced, hence, voluntary and valid. *See United States v. Caceres, supra; United States v. White, supra; Osborn v. United States, supra; Hoffa v. United States, supra; Commonwealth v. Morgan, supra; Commonwealth v. Albrecht, supra; Commonwealth v. Brown, supra; Commonwealth v. Slaton, supra* (Kelly, J., dissenting); *Commonwealth v. Carelli, supra; Commonwealth v. Ginter, supra; Commonwealth v. Schaszberger, supra; Commonwealth v. Morrison, supra.*

Moreover, even applying the *entirely inapplicable* Fifth Amendment, presumptively coercive custodial interrogation, *Miranda* waiver analysis to this Fourth Amendment, non-

coercive non-custodial, consent to search (by submitting to a blood alcohol test) case, the consent was still made "intelligently" as that term is used in *Miranda* waiver analysis. Succinctly, the "intelligent" component in the *Miranda* waiver rule refers to knowledge of the *rights*, and not to knowledge of the *consequences* which may flow from waiver of the rights.

Here, there is absolutely no evidence that appellant, a reasonably intelligent United States citizen, was not aware that she had a right to decline to give express consent for the blood test. The officer requested consent; there is no suggestion in this record that he made a claim of right or authority at the time consent was given. Moreover, there is no history of abusive third degree tactics being employed to coerce consent to submit blood tests from drivers involved in serious auto accidents who are not in custody when consent is requested, so as to justify imposition of prophylactic *Miranda* -type warnings outlining Fourth Amendment rights. *Commonwealth v. Williams, supra* at n. 1; *Commonwealth v. Slaton, supra,* 556 A.2d at 1364. Furthermore, even if there were cause to require such warnings, they still would have to be addressed to the nature of appellant's Fourth Amendment rights, and not the nature of the "criminal ramifications" and tactical disadvantages which might arise from a waiver of Fourth Amendment rights by giving police express consent to search.

Finally, assuming, *arguendo,* that Fifth Amendment custodial interrogation, *Miranda* waiver analysis *could apply,* that the custody limitation to that analysis *would not apply,* and that some aspect of the "intelligent choice" approach rejected by the Supreme Court in the custodial interrogation, Fifth Amendment *Miranda* waiver context, *could nonetheless apply* in this non-custodial, Fourth Amendment, voluntary consent to search (by submitting to a blood alcohol test) case, *I still could not agree with the majority's assessment of the adequacy of the notice of possible criminal ramification provided by the officer.*

Can it reasonably be believed that appellant, who was a driver involved in a fatality causing accident, did not know that it was a crime to drive drunk, or that if the blood test requested by the police officer revealed significant levels of alcohol in her blood that criminal charges might be filed against her? Has the Commonwealth's campaign against drunk driving been *that* ineffective? I think not.

Rather, I would find that, absent evidence of serious mental defect on the part of the suspect, when an officer at the scene of a serious accident asks a driver involved in the accident to consent to take a blood alcohol test (especially when the suspect is informed that the results of the blood alcohol test would be used in the accident investigation) the suspect has been more than sufficiently put on notice of the potential criminal ramifications of consent *by the very circumstances in which the consent to take a blood alcohol test was requested. Cf. Commonwealth v. Dixon, supra,* 379 A.2d at 556 (the circumstances of the request may alone provide adequate notice).

IV. *Conclusion*

In the instant case, appellant was a driver involved in a fatality causing auto accident. The investigating officer asked if she would consent to a blood alcohol test. He informed her that the result of that test would be used in his investigation of the accident. He further informed her that she was *not* under arrest, and that he was not charging her with any crime at that time.

There was no coercion and no deception. Appellant voluntarily consented to take the test, and then voluntarily submitted to the test. I see no grounds to deem the consent invalid.

Neither the United States Constitution, nor the Pennsylvania Constitution, require police officers to talk suspects out of taking blood alcohol tests in the course of gaining their voluntary consent to take such tests. That is precisely

what the majority's analysis will require, and that is precisely why I dissent.

For the foregoing reasons, I respectfully Dissent.